986 So.2d 1 (2007)
The CITY OF NEW ORLEANS and the Honorable C. Ray Nagin, Mayor, In His Individual Capacity
v.
The LOUISIANA ASSESSORS' RETIREMENT AND RELIEF FUND and John Kennedy, Treasurer for the State of Louisiana, In His Official Capacity.
No. 2005-CA-2548.
Supreme Court of Louisiana.
October 1, 2007.
Opinion Dissenting from Denial of Rehearing January 7, 2008.
*5 Adams & Reese, Philip A. Franco, Robert L. Rieger, Jr., Elizabeth A. Roussel, New Orleans, John B. Davis, Baton Rouge, for appellant.
Charles C. Foti, Jr., Attorney General, Charles H. Braud, Jr., Christopher D. Matchett, Assistant Attorneys General, Penya Moses-Fields, City Attorney, Joyce G. Joseph, Evelyn F. Pugh, Assistant City Attorneys, Frank Anthony Milanese, Stone, Pigman, Walther, Wittmann, Wayne J. Lee, Barry W. Ashe, Dana M. Shelton, Ashlee M. Robinson, New Orleans, for appellee.
Randy Patick Zinna, Baton Rouge, for amici curiae, Clerks of Court Retirement and Relief Fund, Municipal Employees' Retirement System, Parachial Employees' Retirement System, Registrars of Voters *6 Employees' System, Teachers' Retirement System of Louisiana.
Randy Patrick Zinna, Baton Rouge, and Ellis Paul Adams, Jr., for amicus curiae, District Attorneys' Retirement System.
WEIMER, Justice.
This matter arises from a challenge to the constitutionality of the statutory funding provisions of the Louisiana Assessors' Retirement Fund ("Fund"). The case is before us on direct appeal from a judgment declaring LSA-R.S. 11:1481, as amended by 2004 La. Acts No. 860, unconstitutional on grounds that it improperly distributes revenue sharing funds to an entity not entitled to receive those funds in violation of La. Const. art. VII, § 26(C), and improperly diverts taxes dedicated to other purposes in violation of La. Const. art. VI, §§ 26(B) and 32.
After reviewing the record, the statute, and the constitutional provisions at issue, we find, contrary to the conclusions of the district court, that LSA-R.S. 11:1481 does not require a percentage of taxes dedicated to other purposes to be diverted from those purposes for which the taxes were enacted in order to finance the Fund; therefore, the statute does not violate the principles of La. Const. art. VI, §§ 26(B) and 32.
We also find that the statute does not distribute revenue sharing funds to an entity not entitled to receive those funds, in contravention of La Const. art. VII, § 26(C). Accordingly, we reverse the judgment of the district court granting in part the motions for partial summary judgment declaring LSA-R.S. 11:1481, as amended by Act 860, unconstitutional and denying the Fund's cross-motion for summary judgment, and remand this matter to the district court for further proceedings consistent with the views expressed herein.

BACKGROUND FACTS AND PROCEDURAL HISTORY
This dispute arises out of a demand by the Fund for monies allegedly owed to the Fund by the City of New Orleans ("City"). The dispute is not unfamiliar to this court, having been before us on several occasions in related litigation.[1]
While the related litigation was pending, the legislature passed 2003 La. Acts No. 1276, amending LSA-R.S. 11:1481, the statutory funding provision for the Assessors' Retirement Fund. In particular, the Act reduced the City's contribution to the *7 Fund from one percent of its ad valorem taxes to one-quarter of one percent and added an enforcement mechanism whereby the Fund could recover the monies allegedly owed by the City directly from the state treasurer from revenue sharing monies due to the City and/or Parish of Orleans.
On September 23, 2003, the City and Mayor C. Ray Nagin, in his individual capacity, instituted the present proceeding, a "Petition for Declaratory Judgment to Invalidate Louisiana Act No. 1276 and for Injunctive Relief." Filed in the 19th Judicial District Court, the petition seeks a declaratory judgment invalidating Act 1276 and a permanent injunction against enforcement of the statute as amended. The petition alleges that LSA-R.S. 11:1481, as amended by Act 1276, is unconstitutional on several grounds: the amendment is an impermissible special or local law adopted without the required notice; it violates separation of powers, equal protection, and due process; it interferes with the City's Home Rule Charter; it impermissibly diverts revenue from dedicated taxes; and it operates as an unlawful bill of attainder.
Before any substantive proceedings could be conducted in this matter, the legislature enacted 2004 La. Acts No. 860, which again amended LSA-R.S. 11:1481. As amended by Act 860, LSA-R.S. 11:1481 now provides a method for financing the Fund as well as a procedure for obtaining amounts due to the Fund from governmental entities that fail to make their required contributions. Essentially, the statute, as amended, requires the official responsible for tax collection in each parish to deduct and remit to the Fund a certain percentage of the total amount of taxes shown to be collectible by the tax rolls. If that official fails to deduct the required contributions and remit them to the Fund, the statute authorizes the Fund to make amicable demand upon the state treasurer for the amounts due from revenue sharing funds.
The City responded to this legislative action by amending its petition to plead the unconstitutionality of LSA-R.S. 11:1481, as amended by Act 860. The City asserted that although some of the constitutional infirmities of Act 1276 had been cured by Act 860, numerous defects of constitutional dimension remain in the amended statute.
On March 7, 2005, relying on the provisions of LSA-R.S. 11:1481 as amended by Act 860, and in particular, LSA-R.S. 11:1481(1)(a)(ii)(cc), the Fund sent a letter to the state's legislative auditor certifying that the City was delinquent in remitting amounts due the Fund for the 2005 tax year, totaling $1,132,016.15. The legislative auditor confirmed that the amount the Fund claimed to be owed by the City/Parish of Orleans for the 2005 tax year was correct. When the City failed to remit the required sums, the Fund made demand upon the state treasurer for the amounts due from the City's 2005 revenue sharing fund allocation, pursuant to LSA-R.S. 11:1481(1)(a)(iii)(bb). Because of the pending litigation questioning the constitutionality of the statute under which the Fund was proceeding, the state treasurer moved for and was granted leave to deposit the monies claimed by the Fund into the registry of the court. The Fund subsequently moved to withdraw the funds from the court's registry.
In response, the City filed a "Motion for Partial Summary Judgment Declaring Louisiana Act No. 860 Unconstitutional and to Enjoin Future Efforts to Divert the City's Revenue Sharing Funds, and for Distribution of Funds Being Held in Registry of Court." The motion, and its accompanying memorandum, avers that LSA-R.S. 11:1481, as amended by Act 860, *8 is unconstitutional because: it violates the separation of powers doctrine established by the Louisiana Constitution; violates equal protection; violates La. Const. art. VII, § 19, which establishes a ceiling on state ad valorem taxes; is an unconstitutional diversion of dedicated taxes in violation of La. Const. art. VI, §§ 26 and 32; amounts to an unconstitutional seizure of public funds in violation of La. Const. art. XII, § X(C); and unconstitutionally diverts revenue sharing dollars in violation of La. Const. art. VII, § 26.
The Board of Commissioners of the Orleans Levee District ("OLD") intervened in the lawsuit and filed a motion for partial summary judgment, adopting the City's arguments. The Fund filed a cross-motion for summary judgment seeking a declaration that LSA-R.S. 11:1481 is constitutional and that the Fund is entitled to the monies deposited into the registry of the court.
Following a hearing on August 1, 2005, the district court found LSA-R.S. 11:1481, as amended by Act 860, unconstitutional on grounds that it improperly distributes revenue sharing funds in violation of La. Const. art. VII, § 26(C), and improperly diverts taxes dedicated to other purposes in violation of La. Const. art. VI, §§ 26(B) and 32. In reaching its conclusion, the court rejected the City's argument that the statute violates the separation of powers doctrine, constitutes an illegal seizure of public funds, and improperly imposes a state ad valorem tax. As to the City's equal protection argument, the district court found that the City had failed to meet its evidentiary burden.
Consistent with its findings, the court signed a written judgment in which it: (1) granted in part the motions for partial summary judgment filed by the City and OLD, and declared LSA-R.S. 11:1481, as amended by Act 860, unconstitutional as violating La. Const. art. VII, § 26(C), and La. Const. art. VI, §§ 26(B) and 32; (2) denied the Fund's cross-motion for summary judgment; and (3) denied the motions for distribution of the funds being held in the registry of the court. The court designated its judgment as final pursuant to the provisions of LSA-C.C.P. art. 1915(B)(1).
On October 3, 2005, the Fund suspensively appealed the district court judgment to this court, which has jurisdiction over the appeal pursuant to La. Const. art. V, § 5(D) and (F).[2]

LAW AND ANALYSIS
The issue before this court is whether the funding mechanism of the Louisiana Assessors' Retirement Fund set forth in LSA-R.S. 11:1481, as amended by Act 860, violates the provisions of the Louisiana Constitution.
The Fund is one of nine statewide retirement systems. Established by the legislature in 1950,[3] the Fund was created to provide retirement allowances and other benefits to the state's assessors, their employees, and employees of the Fund.[4]
*9 In the late 1980's, the state experienced a cash flow crisis. Louisiana Municipal Association v. State, 04-0227, p. 7 (La.1/19/05), 893 So.2d 809, 818, citing Strickland v. State, Office of Governor, 534 So.2d 956 (La.1988). In order to ensure the financial soundness of both state and statewide public retirement systems affected by the crisis, the legislature proposed amending the state constitution. Id. Pursuant to 1987 Acts. No. 947, § 2, the proposal to add paragraph E to La. Const. art. X, § 29 was submitted to the voters and ratified on November 21, 1987. Id. The amendment became effective on December 24, 1987. Id. As enacted, La. Const. art. X, § 29(E) requires that state and statewide retirement systems attain and maintain actuarial soundness and that the legislature establish the particular method of actuarial valuation to be employed for purposes of accomplishing this end. La. Const. art. X, § 29(E)(1).[5] With respect to statewide public retirement systems such as the Fund, whose benefits are not guaranteed by the state, subsection (E)(3) requires that the legislature determine all contributions by members, employers, and "dedicated taxes" required for sound actuarial maintenance of the retirement systems. In addition, this subsection requires the elimination of unfunded accrued liability in these systems by the year 2029, commencing with the 1989-1990 fiscal year. La. Const. art. X, § 29(E)(3).[6]
In the year following the adoption of La. Const. art. X, § 29(E), the legislature enacted Title 11, the "Louisiana Public Retirement Law." Louisiana Municipal Association, 04-0227 at 9, 893 So.2d at 820. In Title 11, the legislature began the process of consolidating the law regarding public retirement systems so as to comply with the constitutional mandate that public retirement systems be maintained on a sound actuarial basis. Id. Ultimately, the laws concerning the six state retirement systems and the nine statewide retirement systems, including the Fund, were consolidated in Title 11. See, 1991 La. Acts No. 74.
The statute at issue in this case, LSA-R.S. 11:1481, is the legislature's response to the mandate of La. Const. art. X, § 29(E)(3) to "determine all required contributions" to the statewide Assessors' Retirement Fund. While the statute addresses the three sources of "required contributions" to the Fundthose from members, employers, and "dedicated taxes"the contest in this case concerns only the provisions directed at determining the "dedicated taxes" required to maintain the Fund's actuarial soundness.[7] *10 Those provisions, as amended by Act 860, are found in LSA-R.S. 11:1481(1)(a), which provides, in pertinent part:
The fund shall be financed as set forth hereunder:
(1)(a)(i) Each sheriff and ex officio tax collector of the state of Louisiana, or other official responsible for such tax collection, is hereby authorized and required to deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax rolls to be exempted by virtue of the homestead exemptions of each respective parish, and the city tax collector for the city of New Orleans, or other official responsible for such tax collection, is hereby authorized and required to deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax roll to be exempted by virtue of homestead exemptions, for the city of New Orleans and the parish of Orleans which money each respective sheriff, tax collector, or any other person performing said duties shall remit to the Assessors' Retirement Fund in a lump sum from first tax collections each year or periodically at the same time said sheriff and tax collector shall disburse funds to the tax recipient bodies of his respective parish. The amount remitted to the Assessors' Retirement Fund shall be based on the total amount of taxes shown to be collectible on the roll, including that shown on the tax roll to be exempted by virtue of homestead exemption, on the date the tax roll is filed for collection.
(ii)(aa) All tax recipient agencies of ad valorem taxes of each and every parish and municipality of the state of Louisiana, including the police jury, council, commission, school board, levee district, special districts, municipalities and all tax recipients of any nature whatsoever of ad valorem taxes are hereby required to furnish the legislative auditor the authorizing ordinances or resolutions, the tax rolls, and the tax rate to be applied to the assessed values for ad valorem tax purposes no later than June first of every year.
(bb) The board shall certify to each sheriff and ex officio tax collector for the state of Louisiana, other official responsible for such tax collection, or any other person performing such duties for any person, parish, city, or governmental entity that all amounts due the fund have been received. For each payment received, the certification shall include the date the fund received the payment, the amount of the payment, and the jurisdiction remitting the payment.
(cc) The board shall calculate any shortfall in the fund and shall take reasonable steps to ascertain its cause. The board shall certify to the legislative auditor the amount of the shortfall and its cause. In the event the shortfall is due to the failure of any person, parish, city, or other governmental entity to remit all funds required by this Section or any predecessor law, the certification shall so indicate.
(dd) The amounts due to the Assessors' Retirement Fund pursuant to this Paragraph shall be certified as correct by the legislative auditor.
(iii)(aa) In addition to the payment required pursuant to Item (i) of this Subparagraph, each sheriff and ex officio tax collector for the state of Louisiana, other official responsible for tax collection, or any other person performing such duties for any person, parish, city, or governmental entity certified by the board as having failed to remit all *11 monies required by this Section, shall remit to the Assessors' Retirement Fund an amount to be determined by the board not to exceed fifteen percent of revenue sharing monies otherwise due to the delinquent parish, city, or other governmental entity over and above the portion being remitted to the fund by that person, parish, city, or governmental entity on July 1, 2004. The remittance pursuant to this Item shall be paid until the amount of the certified shortfall, including interest and any professional fees incurred through attempts at collection, has been satisfied; however, the board has the authority to negotiate a lesser amount to be paid in satisfaction of this debt. The board shall notify the sheriff and ex officio tax collector for the state of Louisiana, other official responsible for tax collection, or any other person performing such duties by November first that said remittance shall be due for the upcoming year.
(bb) Should the sheriff and ex officio tax collector for the state of Louisiana, other official responsible for such tax collection, or any other person performing such duties for any person, parish, city, or other governmental entity fail to comply with Subitem (aa) of this Item, the board of trustees of the Assessors' Retirement Fund is hereby empowered to make demand upon the state treasurer for the monies due to the fund. The treasurer shall pay such demand before distribution of any revenue sharing dollars to the person, parish, city, or other governmental entity. The board shall submit to the treasurer a resolution certifying the name of the governmental entity, its failure to pay, and the amount owed, and authorizing a designee or designees to act on its behalf.
(cc) The remedies provided in this Item are remedial and curative and may be exercised by the board at any time for any identifiable shortfall in the fund, regardless of when the shortfall initially arose.
As amended by Act 860, the statute provides a method of financing the Fund, at least in part, through ad valorem taxes, as well as a procedure for obtaining amounts due the Fund from governmental entities that fail to make their required contributions. Reduced to its basics, the statute requires the official responsible for tax collection in each parish and in the city of New Orleans to deduct and remit to the Fund one-fourth of one percent of the taxes shown to be collectible by the tax rolls, including the amount shown to be exempted by virtue of the homestead exemption. Each year, the Fund, acting through its board, is required to certify to each official responsible for tax collection that the amounts due to the Fund have been received. In the event that all monies are not received, the Fund, again acting through its board, is required to calculate the shortfall, take reasonable steps to ascertain its cause, and certify that information to the legislative auditor, who in turn must certify that the amount claimed to be due to the Fund is correct. The certified shortfall is to be remitted to the Fund from revenue sharing monies otherwise due to the delinquent parish, city or other governmental entity, in an amount not to exceed fifteen percent of the revenue sharing monies otherwise due. In the event that any official responsible for tax collection in any delinquent parish, city or other governmental entity fails to remit the amount due to the Fund, the Fund's board is empowered to make demand upon the state treasurer for payment of the amounts due before distribution of any revenue sharing dollars to the delinquent governmental entity.
*12 In its motion for partial summary judgment, the City argued, and the district court found, that the foregoing provisions violate La. Const. art. VI, §§ 26(B) and 32, in that they improperly divert taxes dedicated to other purposes, and La. Const. art. VII, § 26(C), in that they improperly distribute revenue sharing funds to an entity not entitled to receive the funds. The Fund disputes this finding, arguing that the district court erred in declaring LSA-R.S. 11:1481 unconstitutional and in denying the Fund's cross-motion for summary judgment, which seeks a declaration that the statute is constitutional and seeks the withdrawal of funds from the registry of the court.
In examining the merits of the Fund's position and the correctness of the district court ruling, we must keep certain principles of judicial review in mind.

Principles of Review for Constitutionality
This court reviews judgments declaring a statute unconstitutional de novo. State v. All Property and Casualty Insurance Carriers Authorized and Licensed to do Business in the State, 06-2030, p. 6 (La.8/25/06), 937 So.2d 313, 319; Louisiana Municipal Association v. State, 04-0227 at 45, 893 So.2d at 842. In conjunction with this review, certain principles apply. As a general rule, statutes are presumed to be constitutional; therefore, the party challenging the validity of a statute has the burden of proving its unconstitutionality. State v. Citizen, 04-1841, p. 11 (La.4/1/05), 898 So.2d 325, 334; Louisiana Municipal Association, 04-0227 at 45, 893 So.2d at 842; Board of Commissioners of North Lafourche Conservation, Levee and Drainage District v. Board of Commissioners of Atchafalaya Basin Levee District, 95-1353, pp. 3-4 (La.1/16/96), 666 So.2d 636, 639. Because the provisions of the Louisiana Constitution are not grants of power but instead are limitations on the otherwise plenary power of the people, exercised through the legislature, the legislature may enact any legislation that the constitution does not prohibit. Louisiana Municipal Association, 04-0227 at 45, 893 So.2d at 842-843; Polk v. Edwards, 626 So.2d 1128, 1132 (La.1993); Board of Commissioners of Orleans Levee District v. Department of Natural Resources, 496 So.2d 281, 286 (La.1986). As a result, a party challenging the constitutionality of a statute must point to a particular provision of the constitution that would prohibit the enactment of the statute, and must demonstrate clearly and convincingly that it was the constitutional aim of that provision to deny the legislature the power to enact the statute in question. World Trade Center Taxing District v. All Taxpayers, Property Owners, 05-0374, p. 12 (La.6/29/05), 908 So.2d 623, 632; Caddo-Shreveport Sales and Use Tax Commission v. Office of Motor Vehicles Department Of Public Safety and Corrections of the State, 97-2233, pp. 5-6 (La.4/14/98), 710 So.2d 776, 779; Polk, 626 at 1132. A constitutional limitation on the legislative power may be either express or implied. World Trade Center Taxing District, 05-0374 at 12, 908 So.2d at 632; Caddo-Shreveport Sales and Use Tax Commission, 97-2233 at 6, 710 So.2d at 779-780.
Finally, because it is presumed that the legislature acts within its constitutional authority in enacting legislation, this court must construe a statute so as to preserve its constitutionality when it is reasonable to do so. State v. Fleury, 01-0871, p. 5 (La.10/16/01), 799 So.2d 468, 472; Moore v. Roemer, 567 So.2d 75, 78 (La. 1990). In other words, if a statute is susceptible of two constructions, one of which would render it unconstitutional, or raise grave constitutional questions, the court will adopt the interpretation of the *13 statute which, without doing violence to its language, will maintain its constitutionality. Hondroulis v. Schuhmacher, 553 So.2d 398, 416-417 (La.1988). Nevertheless, the constitution is the supreme law of this state, to which all legislative acts must yield. World Trade Center Taxing District, 05-0374 at 12, 908 So.2d at 632; Caddo-Shreveport Sales and Use Tax Commission, 97-2233 at 6, 710 So.2d at 780. When a statute conflicts with a constitutional provision, the statute must fall. Caddo-Shreveport Sales and Use Tax Commission, 97-2233 at 6, 710 So.2d at 780.

Diversion of Dedicated and Special Taxes
In ruling on the constitutionality of LSA-R.S. 11:1481, as amended by Act 860, the district court found that to the extent the statute allows for the diversion of taxes already dedicated to other purposes, the statute violates La. Const. art. VI, §§ 26(B) and 32. This finding addresses itself to the aspects of LSA-R.S. 11:1481 that seek to provide a method of financing the Fund through ad valorem taxes.
Pursuant to LSA-R.S. 11:1481, each sheriff and ex officio tax collector, or other official responsible for tax collection, is required to "deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax rolls to be exempted by virtue of the homestead exemptions" and to remit that sum to the Fund "in a lump sum from first tax collections each year or periodically at the same time said sheriff and tax collector shall disburse funds to the tax recipient bodies." LSA-R.S. 11:1481(1)(a)(i). In support of its motion for partial summary judgment, the City produced the legislative auditor's report demonstrating how the City's alleged liability to the Fund for the 2005 tax year was calculated. That report illustrates that the dollar amount of funds deposited into the registry of the court was based on the applicable percentage of all ad valorem taxes collectible by the City, including taxes dedicated for specific purposes. The district court ruled that to the extent the language of LSA-R.S. 11:1481 requires the deduction and remittance of a percentage of all ad valorem taxes "shown to be collectible on the tax rolls," including those millages dedicated to specific purposes, the statutory language results in the diversion of dedicated or special taxes to purposes other than those for which they were designated, in violation of the Louisiana Constitution. For the following reasons, we find the district court erred in its conclusion that LSA-R.S. 11:1481 allows and/or requires the diversion of dedicated or special taxes.
The focal issue before us is a narrow one. The question presented to, and ruled on, by the district court was whether dedicated taxes can be used to finance the Fund. In resolving the City's challenge to the constitutionality of the statute, we must constrain our analysis to the issue before us: whether LSA-R.S. 11:1481 is unconstitutional because it allows the Fund to divert dedicated taxes to a purpose other than that for which they were designated.
The diversion of taxes dedicated to a specific purpose is expressly prohibited by La. Const. art. VI, §§ 26(B) and 32, which provide as follows:
La. Const. Art. VI, § 26. Parish Ad Valorem Tax
(B) Millage Increase Not for General Purposes. When the millage increase is for other than general purposes, the proposition shall state the specific purpose or purposes for which the tax is to be levied and the length of time the tax is to remain in effect. All proceeds of the tax shall be used solely for the purpose *14 or purposes set forth in the proposition. [Emphasis added.]
La. Const. Art. VI, § 32. Special Taxes; Authorization
Section 32. For the purpose of acquiring, constructing, improving, maintaining, or operating any work of public improvement, a political subdivision may levy special taxes when authorized by a majority of the electors in the political subdivision who vote thereon in an election held for that purpose.
This court has consistently interpreted the constitution to prohibit the use of dedicated and special taxes for purposes other than those for which they were levied. For example, in Orleans Parish School Board v. City of New Orleans, 238 La. 738, 116 So.2d 505 (La.1959), the Orleans Parish School Board challenged the constitutionality of LSA-R.S. 47:1910, which required the Department of Finance for the City of New Orleans to deduct from taxes collected for the school board a proportionate share of the City's contribution to the expense fund of the Board of Assessors for the Parish of Orleans. The district court granted an injunction and ordered the City to pay to the school board, without any deductions, all of the money collected from a tax levied by the Board. This court affirmed, holding that the challenged statute was unconstitutional insofar as it authorized a deduction from the funds payable to the school board because the legislature has no power to divert to others proceeds the constitution requires "be paid daily to said board." See also, Orleans Parish School Board v. City of New Orleans, 198 La. 483, 3 So.2d 745 (1941) (City could not deduct from school board's tax revenues cost of collecting tax as the constitution requires that the entire amount derived from the tax be paid to the board.); Ziemer v. City of New Orleans, 195 La. 1054, 1067, 197 So. 754, 759 (1940) ("Where [tax] funds are dedicated to a certain purpose they cannot be intermingled with other funds and used indiscriminately, but must be applied as dedicated."). Indeed, this principle was recently confirmed by this court in Denham Springs Economic Development District v. All Taxpayers, Property Owners, 04-1674 (La.2/4/05), 894 So.2d 325, wherein, in interpreting a tax increment financing statute, we recognized that the statute prohibited dedicated taxes from being used for purposes other than their dedicated purpose.
In the instant case, the City argues that with the exception of a "General Municipal Purposes" tax, every tax on which the legislative auditor based his assessment of the City's alleged liability to the Fund for the 2005 tax year is dedicated by the constitution, by statute, and/or by the electorate for a specific purpose and that, to the extent that the language of LSA-R.S. 11:1481 requiring the deduction of a percentage of "taxes shown to be collectible by the tax rolls, including that shown on the tax rolls to be exempted by virtue of the homestead exemptions" includes a percentage of taxes levied or dedicated for special purposes, the statutory language violates the prohibition of La. Const. art. VI, §§ 26(B) and 32.
The Fund responds to the City's assertion with a two-pronged argument.
First, the Fund argues that La. Const. art. X, § 29(E)(3) creates an exception to the prohibition in La. Const. art. VI, §§ 26(B) and 32 against diverting special and dedicated taxes to a purpose other than that for which they were levied. According to the Fund, La. Const. art. X, § 29(E)(3), as the more recent and specific constitutional provision, authorizes the use of existing dedicated taxes to attain and maintain the actuarial soundness of state-wide *15 public retirement systems, in effect overriding the prohibitions in La. Const. art. VI, §§ 26(B) and 32.
Louisiana Const. art. X, § 29(E)(3) provides, in pertinent part:
For statewide public retirement systems not covered by Paragraphs (A) and (B) of this Section, the legislature shall determine all required contributions to be made by members, contributions to be made by employers, and dedicated taxes required for the sound actuarial maintenance of the systems.
At issue is the meaning of the reference in La. Const. art. X, § 29(E)(3) to "dedicated taxes." The Fund argues that because this more recently enacted constitutional provision lists "dedicated taxes" as one of the types of contributions that may be used to achieve the actuarial soundness of statewide retirement systems, taxes dedicated to purposes other than the funding of retirement systems can be used for that purpose. The error in this argument of the Fund is that it would require an interpretation of this constitutional provision that would place it in direct conflict with other provisions of the constitution, i.e., La. Const. art. VI, §§ 26(B) and 32, resulting in a negation of the protections provided by those constitutional provisions. This result we cannot sanction for the following reasons.
As a general rule, articles of the constitution are to be construed and interpreted using the same canons of interpretation applicable to statutes and written instruments. State v. Expunged Record No. 249,044, 03-1940, p. 4 (La.7/2/04), 881 So.2d 104, 107; Louisiana Department of Agriculture and Forestry v. Sumrall, 98-1587, p. 4 (La.3/2/99), 728 So.2d 1254, 1258. Under our well-settled rules of statutory construction, where it is possible, courts have a duty in the interpretation of a statute (or by analogy, constitutional provision) to adopt a construction which harmonizes and reconciles it with other provisions dealing with the same subject matter. LSA-C.C. art. 13; Louisiana Municipal Association, 04-0227 at 36, 893 So.2d at 837; Hollingsworth v. City of Minden, 01-2658, p. 4 (La.6/21/02), 828 So.2d 514, 517. Further, while LSA-C.C. art. 8[8] provides that laws may be repealed either entirely or partially by other laws, and that such a repeal can either be express or implied, it is well-settled in the jurisprudence that repeals by implication are not favored and that a repeal by implication will be found only when there is an irreconcilable conflict between two statutes (or constitutional provisions) and where there exists no possible construction that could give both provisions effect. Jordan v. Louisiana Gaming Control Board, 98-1122, 98-1133, 98-1134, p. 9 (La.5/15/98), 712 So.2d 74, 80-81; State v. Craig, 93-2515, 93-2654, 93-2589, p. 7 (La.5/23/94), 637 So.2d 437, 443; State v. Standard Oil Co. of Louisiana, 188 La. 978, 178 So. 601, 626 (1937).
Applying the foregoing principles in the instant case, we find no conflict between La. Const. art. VI, §§ 26(B) and 32 and Article X, § 29(E)(3) such as would authorize, in section 29(E)(3), what is prohibited elsewhere: the use of dedicated taxes for purposes other than those for which the taxes were levied. To the contrary, the constitutional provisions can easily be construed to harmonize with each other in a manner that gives full effect to each of them. A plain reading of its language demonstrates that the clear intent *16 of La. Const. art. X, § 29(E)(3) was to authorize the legislature to use contributions from three sources to attain and maintain actuarial soundness, including among those sources dedicated taxes which the legislature adopts and dedicates to funding retirement systems. In other words, the dedicated taxes authorized by section 29(E)(3) as one method for attaining actuarial soundness refers to taxes the legislature may levy and dedicate for the purpose of funding statewide retirement systems, not to taxes dedicated by the constitution or by voters to other purposes.
Viewed in this light, the constitutional provisions complement, rather than conflict with, each other. A "dedicated tax" is, quite simply, a tax that is dedicated for a specific purpose. Under the constitution, taxes dedicated to a specific purpose cannot be used for another purpose. Should the legislature elect to levy a "dedicated tax" to fund the Fund, as authorized by Article X, § 29(E)(3), then Article VI, §§ 26(B) and 32 would protect that dedicated tax and prevent the diversion of its proceeds to other purposes.
As we recognized in Denham Springs Economic Development District, 04-1674 at 14, 894 So.2d at 335, when citizens are presented with a proposition that would impose a special tax for a specific purpose, and they approve the imposition of that tax, a covenant is created which must be respected and upheld. Once citizens vote for a tax dedicated to one purpose, the tax cannot be used for a purpose other than that approved by the citizens. Any alteration of a prior dedication must be by vote of the people. The constitution, at Article VI, §§ 26(B) and 32, respects and upholds this most basic proposition.
The language of Article X, § 29(E)(3) does not authorize the diverting of taxes dedicated by voters for one purpose to another purpose, in contravention of Article VI, §§ 26(B) and 32. Rather, section 29(E)(3) is simply an acknowledgment that taxes dedicated to the financing of statewide public retirement systems are one of the funding mechanisms of such retirement systems. Article X, § 29(E)(3) does not constitute an exception to Article VI, §§ 26(B) and 32 that would permit the financing of the Fund through the diversion of taxes dedicated to other purposes.
Perhaps anticipating this conclusion, the Fund argues secondly, and in the alternative, that LSA-R.S. 11:1481(1)(a)(i) does not require the use of special or dedicated taxes to fund the retirement system. Rather, the Fund argues that the statute merely establishes a method of calculating the amount of each governmental entity's required contribution to the Fund, leaving it to the discretion of the local governmental entity to determine the source of the money to be remitted to the Fund. Because not all of the taxes shown to be collectible by the City's tax rolls are dedicated taxes, the Fund argues that the City could meet its obligations under the statute without using any portion of dedicated taxes. In other words, the Fund maintains that the statute is not unconstitutional on its face and that its language can be construed in such a manner as to uphold its constitutionality.
The Fund's argument in this regard is primarily one of statutory interpretation. In evaluating that argument, certain principles of statutory construction apply. First and foremost is the rule that legislation is the solemn expression of the legislative will and, therefore, the interpretation of a law primarily involves the search for the legislature's intent. Louisiana Municipal Association, 04-0227, p. 35, 893 So.2d at 836; Detillier v. Kenner Regional Medical Center, 03-3259, p. 3 *17 (La.7/6/04), 877 So.2d 100, 103; Sultana Corporation v. Jewelers Mutual Insurance Company, 03-0360, p. 3 (La.12/3/03), 860 So.2d 1112, 1115. The starting point in ascertaining that legislative intent is the language of the statute itself. Moss v. State, 05-1963, p. 16 (La.4/4/06), 925 So.2d 1185, 1197; Touchard v. Williams, 617 So.2d 885, 888 (La.1993). In examining that language, words and phrases are to be read in their context and to be accorded their generally prevailing meaning. LSA-C.C. art. 11; LSA-R.S. 1:3. It is presumed that every word, sentence, or provision in a law was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were employed. Moss, 05-1963 at 15, 925 So.2d at 1196; Sultana Corporation, 03-0360 at 9, 860 So.2d at 1119. As a result, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to, and preserving, all words can legitimately be found. Moss, 05-1963 at 15, 925 So.2d at 1196; St. Martin Parish Police Jury v. Iberville Parish Police Jury, 212 La. 886, 33 So.2d 671, 676 (1947).
When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the legislature's intent. LSA-C.C. art. 9; LSA-R.S. 1:4. When the language of a law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. LSA-C.C. art. 10. Finally, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. LSA-C.C. art. 12.
At issue here is the interpretation to be accorded LSA-R.S. 11:1481(1)(a)(i) which provides:
Each sheriff and ex officio tax collector for the state of Louisiana, or other official responsible for such tax collection, is hereby authorized and required to deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax rolls to be exempted by virtue of the homestead exemptions of each respective parish, and the city tax collector for the city of New Orleans, or other official responsible for such tax collection, is hereby authorized and required to deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax roll to be exempted by virtue of homestead exemptions, for the city of New Orleans and the parish of Orleans which money each respective sheriff, tax collector, or any other person performing said duties shall remit to the Assessors' Retirement Fund in a lump sum from first tax collections each year or periodically at the same time said sheriff and tax collector shall disburse funds to the tax recipient bodies of his respective parish. The amount remitted to the Assessors' Retirement Fund shall be based on the total amount of taxes shown to be collectible on the roll, including that shown on the tax roll to be exempted by virtue of homestead exemption, on the date the tax roll is filed for collection.
As enacted, the first sentence of this provision authorizes and requires the official responsible for tax collection in each respective jurisdiction "to deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax rolls to be exempted by virtue of the homestead exemptions," which money each tax collector is directed to "remit" to the Fund "in a lump sum *18 from first tax collections each year or periodically at the same time said sheriff and tax collector shall disburse funds to the tax recipient bodies of his respective parish." Read in insolation, the instruction to "deduct" one-fourth of one percent of all "taxes shown to be collectible by the tax rolls" could be construed to require the tax collector to deduct one-fourth of one percent from the amount due each tax recipient agency, including those that receive only dedicated taxes, and then remit that sum to the Fund. Such a requirement, to the extent that it would result in every tax recipient body, including those that rely on special and dedicated taxes, being deprived of one-fourth of one percent of taxes otherwise due, would violate the constitutional prohibitions against diversion of dedicated taxes, and render the statute unconstitutional.
However, this phrase cannot, consistent with well-settled rules of statutory interpretation, be read in isolation. A statute cannot be interpreted by review of select portions of the statutory scheme. All the words must be read together. As we have repeatedly cautioned, the meaning and intent of a law must be determined by a consideration of the law in its entirety. Moss, 05-1963 at 15, 925 So.2d at 1196; Sultana Corporation, 03-0360 at 4; 860 So.2d at 1116; Succession of Boyter, 99-0761, p. 9 (La.1/7/00), 756 So.2d 1122, 1129. Moreover, in construing statutes, "courts must endeavor to give an interpretation that will give them effectiveness and purpose, rather than one which makes them meaningless." State v. Cunningham, 04-2200, pp. 8-9 (La.6/13/05), 903 So.2d 1110, 1116; State v. Union Tank Car Company, 439 So.2d 377, 382 (La.1983). Thus, if there are two ways to interpret a statute, courts are to interpret the statute in such a manner as to uphold its constitutionality. Cunningham, 04-2200 at 9, 903 So.2d at 1116.
In this case, the sentence which immediately follows the first one elucidates and clarifies the intent of the provision. That sentence explains that "[t]he amount remitted to the Assessors' Retirement Fund shall be based on the total amount of taxes shown to be collectible on the roll, including that shown on the tax roll to be exempted by virtue of homestead exemption." (Emphasis supplied.) A plain reading of this sentence, in conjunction with the previous one, demonstrates that the intent of the statute is simply to provide direction as to the method of calculating the amount of each governmental entity's obligation to the Fund. The statute does not direct, require, or identify from which source the funds to pay this amount are to be deducted prior to being remitted.
To interpret the statute otherwise would lead to absurd consequences. This is because the statute clearly includes in the amounts from which the "deduction" is to be made those taxes shown to be "collectible" (i.e., taxes which could have been collected as opposed to taxes actually collected), "including that shown on the tax roll to be exempted by virtue of homestead exemption." Because a tax collector cannot "deduct" and "remit" from taxes he or she does not collect, it is apparent that the statute does not attempt to identify the source of the monies to be remitted to the Fund; it specifies only the method of identifying and calculating the amount due.
This interpretation of the statute is bolstered by the fact that nowhere in the language of the statute is there a directive that the amount required to be remitted to the Fund be paid from dedicated or special taxes. Nor is there a directive that the person responsible for tax collection in each respective jurisdiction deliver less than that full amount of dedicated revenues *19 to the tax recipient body that is the beneficiary of dedicated or special taxes. The reason for such an omission is obvious: the use of dedicated or special taxes for any purpose other than that for which they are designated is specifically prohibited by the constitution. La. Const. art. VI, §§ 26(B) and 32. These constitutional provisions mandate that each recipient fund receive the full measure of what is due from dedicated funds.
To successfully challenge a legislative act as unconstitutional on its face, the challenger must establish that no circumstances exist under which the act would be valid. AFSCME, Council # 17 v. State, Department of Health and Hospitals, 01-0422, p. 8 (La.6/29/01), 789 So.2d 1263, 1269; State v. Powdrill, 95-2307, p. 9 (La. 11/25/96), 684 So.2d 350, 357. As demonstrated above, it is possible to achieve a construction of the statute that renders it constitutional.[9]
As we explained in Louisiana Municipal Association v. State, "The legislative power includes `absolute control over the finances of the state, except as limited by constitutional provisions.'" Id., 04-0227 at 46, 893 So.2d at 843, quoting Louisiana Public Facilities Authority v. Foster, 01-0009, p. 18 (La.9/18/01), 795 So.2d 288, 301. It is the legislature's particular province to determine how the departments of government shall be funded from the public fisc. Id. The Louisiana constitution mandates in Article X, § 29(E) that the legislature attain and maintain actuarial soundness in the state and statewide public retirement systems. The constitution does not dictate how that actuarial soundness is to be accomplished. Instead, the mechanism by which actuarial soundness is achieved is left to the discretion of the legislature. Louisiana Municipal Association, 04-0227 at 58, 893 So.2d at 850-851.
In this case, in enacting LSA-R.S. 11:1481, the legislature has endeavored to set forth the manner in which the statewide Assessors' Retirement Fund is to be financed and its actuarial soundness achieved. A plain reading of the statute reveals that Section (1)(a)(i)of the statute instructs as to the proper method of calculating the amount of each governmental entity's required contribution to the Fund so that an appropriate amount can be deducted and then remitted to the Fund. Contrary to the conclusion of the district court, its language does not direct or dictate that the required contribution be paid from special or dedicated taxes.
Because we find that the statute can be interpreted in such a manner as to render it consistent, and not in conflict, with the constitutional prohibitions against the diversion of dedicated or special taxes, we reverse the district court's ruling declaring LSA-R.S. 11:1481, as amended by Act 860, unconstitutional as violating La. Const. art. VI, §§ 26(B) and 32.

Diversion of Revenue Sharing Funds
In ruling on the constitutionality of LSA-R.S. 11:1481, as amended by Act 860, *20 the district court also found that the statute distributes revenue sharing funds to an entity not entitled to receive those funds, in violation of La. Const. art. VII, § 26(C). This finding addresses itself to the sections of LSA-R.S. 11:1481 that provide a procedure for obtaining amounts due the Fund from governmental entities that fail to make their required contributions.
As amended by Act 860, LSA-R.S. 11:1481(1)(a)(ii), supra, outlines the procedure that must be followed by the Fund to calculate and certify the amount and cause of any shortfall in required contributions to the Fund. When the procedure is followed, and the shortfall is determined to be due to the failure of any person, parish, city, or other governmental entity to remit all funds required, section (1)(a)(iii)(aa), supra, provides that the shortfall is to be remitted to the Fund from revenue sharing monies otherwise due to the delinquent parish, city, or other governmental entity, in an amount to be determined by the Fund, not to exceed fifteen percent of the revenue sharing monies otherwise due. In the event that any official responsible for tax collection in any delinquent parish, city, or other governmental entity fails to remit the amount due to the Fund, section (1)(a)(iii)(bb), supra, of the statute empowers the Fund's board to make demand upon the state treasurer for payment of the amounts due before distribution of any revenue sharing dollars to the delinquent governmental entity. In other words, the statute allows the Fund to tap into revenue sharing dollars to make up for any shortfall in the required contributions.
The City argued, and the district court held, that this portion of the statute violates La. Const. art. VII, § 26(C) by diverting revenue sharing dollars to an entity that would otherwise not be entitled to receive such funds. Before this court, the Fund argues that the district court erred in reaching this conclusion, asserting that La. Const. art. VII, § 26(C) clearly and unambiguously sanctions legislative action, such as LSA-R.S. 11:1481(1)(a)(iii), permitting the state treasurer to deduct from revenue sharing funds amounts due for retirement systems, such as the Fund.
At issue are the scope and meaning of La. Const. art. VII, § 26(C), which provides as follows:
Distribution Formula. The revenue sharing fund shall be distributed annually as provided by law solely on the basis of population and number of homesteads in each parish in proportion to population and the number of homesteads throughout the state. Unless otherwise provided by law, population statistics of the last federal decennial census shall be utilized for this purpose. After deductions in each parish for retirement systems and commissions as authorized by law, the remaining funds, to the extent available, shall be distributed by first priority to the tax recipient bodies within the parish, as defined by law, to offset current losses because of homestead exemptions granted in the Article. Any balance remaining in a parish distribution shall be allocated to the municipalities and tax recipient bodies within each parish as provided by law. [Emphasis supplied.]
The Fund argues that La. Const. art. VII, § 26(C) clearly and unambiguously contemplates and permits the deductions authorized by LSA-R.S. 11:1481(1)(a)(iii), pointing to the language in this constitutional provision which directs the distribution of revenue sharing funds to tax recipient bodies "[a]fter deductions in each parish for retirement systems and commissions as authorized by law." (Emphasis supplied.) We agree.
*21 As previously noted, this court has established that articles of the constitution are to be interpreted using the same canons of interpretation applicable to statutes and written instruments. Louisiana Department of Agriculture and Forestry, 98-1587 at 4, 728 So.2d at 1258. Thus, when a constitutional provision is clear and unambiguous, its language must be given effect. Louisiana Department of Agriculture and Forestry, 98-1587 at 4, 728 So.2d at 1258, quoting Aguillard v. Treen, 440 So.2d 704, 707 (La.1983). As explained in Louisiana Department of Agriculture and Forestry:
This principle, most basic to civilian methodology, has been in our Civil Code since 1870: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. C.C. art. 9; Cat's Meow, Inc. v. City of New Orleans, 98-0601 (La.10/20/98), 720 So.2d 1186. Therefore when interpreting a constitutional provision, the "starting point" is with the language of the provision. Id. (citing Touchard v. Williams, 617 So.2d 885 (La.1993)).
Louisiana Department of Agriculture and Forestry, 98-1587 at 5, 728 So.2d at 1258.
Giving the straightforward language of La. Const. art. VII, § 26(C) its ordinary meaning, we find this constitutional provision clearly permits deductions from revenue sharing funds for purposes of retirement systems as long as the deductions are "authorized by law." The words "authorized by law" are not ambiguous; nor are the words susceptible to more than one reasonable interpretation. An action is "authorized by law" when legislation has been enacted sanctioning the action. Such legislation authorizing deductions from revenue sharing funds when a governmental entity fails to make its required contribution to the Fund is provided in LSA-R.S. 11:1481(1)(a)(iii). Because the constitution unambiguously permits the deductions authorized by LSA-R.S. 11:1481(1)(a)(iii), this section of the statute is constitutional and does not, as opined by the district court, violate La. Const. art. VII, § 26(C).
The City defends the contrary ruling by the district court, arguing that the interpretation which we accord to the constitutional provision conflicts with the interpretation presented to the Constitutional Convention that adopted the language. According to the City, there are two plausible interpretations of the language, rendering it ambiguous and necessitating resort to legislative history to ascertain the legislative intent. East Baton Rouge Parish School Board v. Foster, 02-2799, pp. 16-17 (La.6/6/03), 851 So.2d at 996.
The City asserts that the proceedings at the 1973 Constitutional Convention included specific discussion as to exactly what would constitute permissible "deductions in each parish for retirement systems," and it was explained by one of the delegates that this language referred to "deductions for retirement systems and commissions, as presently authorized by law." VIII Records of the Louisiana Constitutional Convention of 1973: Convention Trans., November 1, 1973, p. 2064. (Emphasis supplied.) The City points out that what was "presently authorized by law" at that time were deductions to compensate various retirement funds for the repeal of the state ad valorem tax, a recently abolished 5.75 mill levy, of which the Fund was entitled to a tiny variable percentage. According to the City, La. Const. art. VII, § 26(C) was never intended to allow the legislature to adopt additional deductions from revenue sharing funds after 1974, the effective date of the constitution. Such additional deductions could potentially *22 result in the exhaustion of all revenue sharing funds due to a tax recipient body for a particular year, negating the very purpose for which the revenue sharing fund was created: to compensate tax recipient bodies for revenues lost to the homestead exemption. Rather, the City maintains that the phrase "as authorized by law" in La. Const. art. VII, § 26(C) was intended to apply only to those deductions for the benefit of retirement systems that were already authorized at the time the constitutional provision became effective.
The flaw in the City's argument lies in its approach to the well-settled rules of construction. The City fails to examine the language of the constitutional provision to determine whether it is clear and unambiguous, and therefore must be applied as written, or whether it is subject to more than one reasonable interpretation, and therefore, ambiguous, authorizing resort to legislative history to discern the legislative intent. The City starts with the legislative history and uses that legislative history to construct an argument for the ambiguity of the constitutional provision. However, it is well-settled in our jurisprudence that the appropriate starting point is the language of the statute itself. Touchard v. Williams, 617 So.2d 885, 888 (La.1993). Where, as here, that language is straightforward and unambiguous, no further interpretation may be made in search of legislative intent. LSA-C.C. art. 9; East Baton Rouge Parish School Board, 02-2799 at 6-7, 851 So.2d at 1005 (Weimer, J., dissenting) ("[O]nce it is determined that the constitutional provision is unambiguous, there is no need to evaluate the intent of the framers and voters."). The legislative intent is made manifest in the words of the constitutional provision. Willis-Knighton Medical Center v. Caddo-Shreveport Sales and Use Tax Commission, 04-0473, p. 41 (La.4/1/05), 903 So.2d 1071, 1096; State v. Williams, XXXX-XXXX, p. 13 (La.11/28/01), 800 So.2d 790, 800.
Had the framers of the constitution, and the voters who enacted it, intended to freeze the deductions for the benefit of retirement systems at levels existing at the time of the ratification of the constitution, they could easily have done so by adding the language the City would have us insert, "as presently authorized by law." This was not done. As is the case with contractual interpretation, when construing articles of the constitution, this court is not free to create an ambiguity where none exists, or to revise or re-write the language of the constitutional provision under the guise of interpretation where the provisions are couched in unambiguous terms. Sims v. Mulhearn Funeral Home, Inc., 07-0054, p. 8-9 (La.5/22/07), 956 So.2d 583, 589. The plain meaning of the unambiguous language of La. Const. art. VII, § 26(C) is to permit deductions from revenue sharing funds for the benefit of retirement systems when the deductions are authorized by law.[10] When a governmental entity fails to make its required contribution to the Fund, LSA-R.S. 11:1481(1)(a)(iii) authorizes such deductions. *23 As amended by Act 860, the statute does not violate the provisions of La. Const. art. VII, § 26(C). The district court erred in ruling to the contrary.

Separation of Powers
The City also challenges the constitutionality of LSA-R.S. 11:1481(1)(a)(iii), as amended by Act 860, on grounds that it violates the separation of powers doctrine. Pointing to La. Const. art. II, §§ 1 and 2, which provide that the powers of government are divided into three separate brancheslegislative, executive, and judicialand that no one of these branches, nor any person holding office in one of them, shall exercise power belonging to either of the others, the City argues that LSA-R.S. 11:1481(1)(a)(iii), as amended by Act 860, represents a legislative attempt to interfere in a dispute that is the province of the judicial branch because it is the subject of ongoing related litigation in which the City has challenged the Fund's entitlement to any city taxes. See footnote 1. According to the City, Act 860 represents an improper attempt by the legislature to meddle in that dispute and provide a means by which the Fund can obtain the result that it seeks-contributions from the City-without having to await a judicial determination of the rights and obligations of the parties.
The district court rejected the City's challenge on this ground, ruling that the legislature has the plenary power to pass any legislation not prohibited by the constitution, irrespective of whether there is an ongoing dispute. Before this court, the City questions the validity of the district court's ruling, arguing that Act 860 impairs the City's vested right to receive revenue sharing funds appropriated to it by virtue of the Revenue Sharing Appropriations Act and La. Const. art. VII, § 26(C), and, therefore, is prohibited by the constitution.
The argument advanced by the City was addressed previously by this court, and rejected, in Morial v. Smith & Wesson Corporation, XXXX-XXXX (La.4/3/01), 785 So.2d 1. In that case, the Mayor and City of New Orleans had filed suit against the firearms industry for damages allegedly suffered by the City arising from the manufacture, marketing, promotion, and sale of unreasonably dangerous firearms. Subsequent to the filing of suit, the legislature enacted LSA-R.S. 40:1799, which purported to preclude such suits by abolishing the City's right of action and reserving to the state the authority to bring these suits. The City challenged the constitutionality of the statute on several grounds, among them that the statute violated the separation of powers by legislatively interfering with a pending judicial action. This court rejected the City's argument in this regard, noting that "[t]he legislature has always enjoyed the power to create new rights and abolish old ones as long as it does not interfere with vested rights." Morial, XXXX-XXXX at 25, 785 So.2d at 19. The court further noted that the City, as a political subdivision of the state rather than a person, is not protected by the Declaration of Rights article of the Louisiana Constitution, Article I, and, therefore, is not protected by the constitutional prohibitions against impairment of contractual rights or disturbance of vested rights contained therein. Morial, XXXX-XXXX at 15-16, 785 So.2d at 13-14.
This court's ruling in Morial answers the argument of the City herein. The separation of powers doctrine is not violated by LSA-R.S. 11:1481(1)(a)(iii), as amended by Act 860.

Seizure of Public Funds
Additionally, the City contends that LSA-R.S. 11:1481(1)(a)(iii), as amended *24 by Act 860, violates La. Const. art. XII, § 10. According to the City, because revenue sharing monies are dedicated by La. Const. art. VII, § 26(C) for a public use (namely, to offset revenues lost as a result of the state homestead exemption), its revenue sharing fund allocation constitutes "public funds." Louisiana Constitution article XII, § 10 provides that "no public property or public funds shall be subject to seizure." To the extent that LSA-R.S. 11:1481 allows the Fund to collect monies it claims are due via the diversion of the City's revenue sharing monies, the City argues that it amounts to the unilateral imposition of a "judgment" against the City and a seizure of public funds to satisfy that "judgment" in contravention of the constitution.
The district court rejected the City's argument in this regard, ruling that for the constitutional prohibition against seizure of public funds to apply, there must first be a judgment, and, in this case, there has been no judgment against the City and nothing is being seized as a result of any suit or judgment. The district court's ruling in this regard is correct.
Louisiana Constitution article XII, § 10(C) provides:
Limitations; Procedure; Judgments. Notwithstanding Paragraph (A) or (B) or any other provision of this constitution, the legislature by law may limit or provide for the extent of liability of the state, a state agency, or a political subdivision in all cases, including the circumstances giving rise to liability and the kinds and amounts of recoverable damages. It shall provide a procedure for suits against the state, a state agency, or a political subdivision and provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. The legislature may provide that such limitations, procedures, and effects of judgments shall be applicable to existing as well as future claims. No judgment against the state, a state agency, or a political subdivision shall be exigible, payable, or paid except from funds appropriated therefor by the legislature or by the political subdivision against which the judgment is rendered.
A plain reading of this provision reveals that the prohibition against seizure of public funds applies only when the seizure is the product of a judgment resulting from a lawsuit. Because LSA-R.S. 11:1481(1)(a)(iii) does not involve an attempt to enforce a judgment against the City or an attempt to seize public funds as the result of any judgment emanating from any lawsuit, the prohibition of La Const. art. XII, § 10 simply does not apply. The constitution's prohibition against seizure of public funds is not violated by LSA-R.S. 11:1481(1)(a)(iii), as amended by Act 860.

Ceiling on State Ad Valorem Tax
The City also assails the constitutionality of LSA-R.S. 11:1481, as amended by Act 860, on grounds that it allows the legislature to impose what amounts to a substitute for a state ad valorem tax and thereby evade the constitution's 5.75 mill ceiling on state ad valorem taxes without actually passing a tax. The district court rejected this challenge to the constitutionality of the statute, ruling that the statute does not impose an additional tax, and thus there is no violation or circumvention of the 5.75 mill ceiling. This district court's ruling in this regard is correct.
Louisiana Constitution article VII, § 19 provides:
State taxation on property for all purposes shall not exceed an annual rate of five and three-quarter mills on the dollar of assessed valuation.
The City argues that LSA-R.S. 11:1481 violates this constitutional provision because *25 it attempts to do indirectly, by taking a portion of the City's ad valorem tax revenues, what the legislature must do directly, i.e., enact a state ad valorem tax. The net result of this action, the City argues, is to allow the state to evade the constitution's 5.75 mill ceiling on such taxes.[11]
The Fund responds to the City's argument by pointing out that LSA-R.S. 11:1481 is not an additional tax, but an internal funding mechanism that appropriates money from one governmental entity to another. In other words, the statute involves allocation and not taxation. Because the statute does not impose any additional tax burden on the citizens of Louisiana, the Fund argues that it cannot, by definition, violate the provisions of La. Const. art. VII, § 19.
As noted previously, the legislature may enact any legislation that the constitution does not prohibit. Louisiana Municipal Association, 04-0227 at 45, 893 So.2d at 843. The fundamental flaw with the City's argument is that, notwithstanding the fact that the statute does not impose an additional tax, and thus does not implicate the constitutional provision imposing a 5.75 mill ceiling on state ad valorem taxes, the City fails to demonstrate, or offer any evidence to establish, that the amounts collected pursuant to LSA-R.S. 11:1481 exceed the 5.75 mill ceiling imposed by the constitution. As a result, even assuming the validity of its argument that the statute attempts to do indirectly what the state must do directly, i.e., enact a state ad valorem tax, the City's challenge to the constitutionality of LSA-R.S. 11:1481, as amended by Act 860, on grounds that it violates the ceiling on state ad valorem taxes imposed by La. Const. art. VII, § 19 is without merit.

Equal Protection Violation
Finally, the City asserts that LSA-R.S. 11:1481, as amended by Act 860, is unconstitutional because it violates equal protection guaranties as to Mayor Nagin in his individual capacity as a property owner and ad valorem taxpayer in the City of New Orleans. According to the City, the statute violates the protections of La. Const. art. I, § 3 and the Fourteenth Amendment to the United States Constitution because the municipal taxes of New Orleans' taxpayers are included in the computation of required contributions to the Fund, whereas the 63 other parishes in the state do not include municipal or city taxes in their computation of the required contribution.
In support of its argument alleging disparate treatment, the City introduced into evidence the following: (1) excerpts from the Tax Review Manual of the Legislative Auditor indicating that, in preparing the pension fund contribution report, which it does as a courtesy to the parish tax collectors, municipal taxes are not included; (2) excerpts from the trial testimony of Paulette Jackson, assistant Legislative Auditor, in the related litigation, Louisiana Assessors' Retirement Fund v. City of New Orleans, No. 94-05896, on the docket of the Civil District Court, Parish of Orleans, confirming that in preparing the pension fund contribution report, municipal taxes are typically excluded from the *26 parish grand recap report; (3) additional excerpts from the deposition of Paulette Jackson to the same effect; (4) the 2005 Orleans Parish Pension Report prepared by the legislative auditor; and (5) the judgment and reasons for judgment issued by the district court in the related litigation finding an equal protection violation because, among other reasons, the statute applies to all of the City's tax collections whereas in every other parish, the statute applies only to parish taxes.[12]
After reviewing this evidence and entertaining the argument of the parties, the district court rejected the City's challenge to the constitutionality of LSA-R.S. 11:1481, finding that the evidence submitted by the City was insufficient to establish an equal protection violation. Our review of the law and evidence convinces us that the district court's ruling in this regard is correct.
The Fourteenth Amendment to the United States Constitution provides, in part, that "[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." Additionally, La. Const. art. I, § 3 provides:
No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.
Generally, the state constitutional guarantee of equal protection mandates that state laws affect alike all persons and interests similarly situated. Beauclaire v. Greenhouse, 05-0765, p. 5 (La.2/22/06), 922 So.2d 501, 505. This guarantee does not remove from the legislature all power of classification, or require absolute equality or precisely equal advantages; the law merely requires equal application in similar circumstances. Id.
In Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094, this court set forth the proper analysis for determining whether an equal protection violation has occurred. We explained:
Article I, Section 3 commands the courts to decline enforcement of a legislative classification of individuals in three different situations: (1) When the law classifies individuals by race or religious beliefs, it shall be repudiated completely; (2) When the statute classifies persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of the classification shows that the classification has a reasonable basis; (3) When the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state interest. [Footnotes omitted.]
Sibley, 477 So.2d at 1107. In this case, the legislative classification that the City challenges is based neither on race, religious beliefs, birth, age, sex, culture, physical condition, or political ideas or affiliations. As a result, the third level of scrutiny applies. Under this third level of scrutiny, *27 the law creating the classification is presumed to be constitutional and the party challenging its constitutionality has the burden of proving it unconstitutional by showing the classification does not suitably further any appropriate state interest. Beauclaire, 05-0765 at 6; 922 So.2d at 505-506; State v. Expunged Record No. 249,044, 03-1940 at 10, 881 So.2d at 111; State v. Fleury, 01-0871 at 7, 799 So.2d at 473.
A review of the evidence and argument presented by the City in connection with its summary judgment motion reveals that although the City claims that LSA-R.S. 11:1481 violates the equal protection guarantee because it treats New Orleans taxpayers differently from other state taxpayers, the City failed to offer any evidence to demonstrate convincingly either that the statute creates a legislative classification on its face, or that the classification does not suitably further any appropriate state interest. In this regard, it is important to note that what is being challenged in this case is the constitutionality of LSA-R.S. 11:1481, as amended by Act 860. Act 860 amended the provisions of LSA-R.S. 11:1481(1)(a)(ii)(aa) to state:
All tax recipient agencies of ad valorem taxes of each and every parish and municipality of the state of Louisiana, including the police jury, council, commission, school board, levee district, special districts, municipalities and all tax recipients of any nature whatsoever of ad valorem taxes are hereby required to furnish the legislative auditor the authorizing ordinances or resolutions, the tax rolls, and the tax rate to be applied to the assessed values for ad valorem tax purposes no later than June first of every year.
According to this provision, all tax recipient agencies of ad valorem taxes of each and every parish and municipality are now required to furnish the legislative auditor with the authorizing ordinances or resolutions, the tax rolls and the tax rate to be applied. As amended, therefore, the statute does not appear to single out the municipal taxes of the City of New Orleans for disparate treatment. The documents introduced by the City to establish disparate treatment pre-date the passage of Act 860; thus, their relevance to the instant proceeding, which assails the constitutionality of the statute as amended, is attenuated.[13]
Further, the Tax Review Manual of the legislative auditor on which the City relies to support its equal protection argument specifically states that "[t]here is no statutory authority for us to generate the pension fund contribution report. We prepare the report as a courtesy to the tax collectors and the eight retirement systems." There is no indication, and the City offers no evidence, as to what the various tax collectors do with the pension fund contribution report once it is generated by the legislative auditor and to what extent, if any, these tax collectors rely on the report when they make the remittance required by the statute. As a result, there is no evidence establishing that the monies actually being remitted to the Fund by the tax collectors are based on the legislative auditor's pension fund contribution report, and the alleged omission of municipal ad valorem taxes for 63 parishes from that report. Louisiana Revised Statites 11:1481 mandates that the required contributions be remitted to the Fund by the person responsible for tax collection in each jurisdiction, not the legislative auditor; *28 yet the City produced no evidence as to the amounts actually being remitted by the various tax collectors.[14]
The City simply has not offered sufficient evidence to demonstrate either that the statute creates a legislative classification on its face or that it does not suitably further an appropriate state interest. Thus, the City has not carried its burden of proving that LSA-R.S. 11:1481, as amended by Act 860, is unconstitutional.[15]

CONCLUSION
For the foregoing reasons, we find that the district court erred in declaring LSA-R.S. 11:1481, as amended by Act 860, unconstitutional as violating La. Const. art. VII, § 26(C), and La. Const. art. VI, §§ 26(B) and 32. We therefore reverse the judgment of the district court granting in part the motions for partial summary judgment filed by the City and the OLD and declaring LSA-R.S. 11:1481, as amended by Act 860, unconstitutional; we find that the district court properly rejected the challenges to the statute's constitutionality on the remaining grounds asserted by the City and the OLD, i.e., that it violates the separation of powers doctrine, the constitutional prohibition against seizure of public funds, the constitutional ceiling on state ad valorem taxes, and the equal protection guarantees of the United States and Louisiana Constitutions. We find that, ultimately, the district court erred in denying the Fund's cross-motion for summary judgment seeking a declaration that LSA-R.S. 11:1481, as amended by Act 860, is constitutional, and reverse that judgment as well. Finally, we note that the district court denied the competing motions for distribution of the funds being held in the registry of the court, ordering the funds to remain in the registry pending further orders of the district court. We therefore remand this case to the district court for further proceedings consistent with the opinion of this court.
REVERSED AND REMANDED.
CALOGERO, C.J., dissents and assigns reasons.
JOHNSON, J., concurs in the result.
CALOGERO, Chief Justice, Dissenting.
Because I believe the district court correctly found that the current version of La.Rev.Stat. 11:1481, which governs financing of the Louisiana Assessors' Retirement Fund ("LARF"), is unconstitutional, I respectfully dissent from the majority opinion reversing that decision. As the majority correctly notes, the Louisiana Legislature has plenary power to "enact any legislation that the state constitution *29 does not prohibit." On the other hand, the legislature's plenary power is limited by the state constitution. In my view, La.Rev.Stat. 11:1481 clearly violates provisions of the Louisiana Constitution, including, as the district court found, La.Const. art. VI, §§ 26(B) and 32, governing dedicated and special taxes, and La. Const. art. VII, § 26, governing revenue sharing.
This case arises out of the legislature's apparent effort to meet the requirements of La. Const. art. X, § 29(E) that "actuarial soundness of state and statewide retirement systems shall be attained and maintained," including LARF. LARF is a statewide retirement system, one not guaranteed by the state, and thus subject to the provisions of La. Const. art. X, § 29(E)(3), which authorizes the legislature to "determine all required contributions to be made by members, employers and dedicated taxes for the sound actuarial maintenance of the systems." Louisiana Municipal Assn. v. State, 04-0227, p. 8 (La.1/19/05), 893 So.2d 809, 818. Thus, the Louisiana Constitution recognizes only three sources of funding for statewide retirement systems, like LARFi.e., employer contributions, employee contributions, and dedicated taxes.
La.Rev.Stat. 11:1481 is located in Louisiana Revised Statutes in Title 11, "Consolidated Public Retirement Systems"; Subtitle III, "Statewide Systems"; Chapter 1, "Assessors' Retirement Fund"; Part V, "Financing of Fund." The title of the statute is "Financing of fund; deductions, deficiencies and surpluses; remedies." Thus, the provision represents the Louisiana Legislature's effort to "determine" the amount of required contributions from employers, employees, and dedicated taxes necessary to fund LARF in such way that its actuarial soundness is attained and maintained, as required by La. Const. art. X, § 29(E). In fact, La.Rev.Stat. 11:1481 properly addresses the first two of the three possible funding sources for funding statewide retirement systems set forth in La. Const. art. X, § 29(E). Employer contributions are addressed in La.Rev.Stat. 11:1481(1)(b), and employee contributions are addressed in La.Rev.Stat. 11:1481(2)(a). The City, of course, does not challenge either of those provisions.
Given the fact that La.Rev.Stat. 11:1481 expressly addresses the first two funding sources recognized by La. Const. art. X, § 29(E)-i.e., employer contributions and employee contributions, the statute might also be expected to address the third possible funding source set forth in La. Const. art. X, § 29(E)-i.e., dedicated taxes. Such a dedicated tax could have been adopted as part of La.Rev.Stat. 11:1481 or a separate provision. However, the legislature did not adopt and dedicate a tax to fund LARF.[1]
In lieu of adopting and dedicating a tax to fund LARF, the legislature adopted La. Rev.Stat. 11:1481(1)(a)(i), which is the focus of the City's challenge herein. As further described below, La.Rev.Stat. 11:1481(1)(a)(i) was designed by the legislature to establish an elaborate two-part statutory scheme for diverting a portion of ad valorem taxes to fund LARF, thus allowing the legislature to avoid the (potentially unpopular) necessity of actually adopting and dedicating a separate tax for that purpose. As further explained below, the first part of the legislative scheme is set forth in La.Rev.Stat. 11:1481(1)(a)(i), *30 which, the City claims, unconstitutionally violates La. Const. Art. VI, §§ 26(B) and 32, by improperly diverting special and dedicated taxes. The second part of the legislative scheme is set forth in La.Rev. Stat. 11:1481(1)(a)(ii) and (iii), which, the City claims, unconstitutionally violate La. Const. VII, § 26, by improperly diverting revenue sharing funds.

Diversion of special and dedicated taxes
The City argues, and the district court found, that La.Rev.Stat. 11:1481(1)(a)(i), as most recently amended by 2004 La. Acts, No. 860, violates La. Const. Art. VI, §§ 26(B) and 32, because it results in an improper diversion to LARF of dedicated and special taxes from the purposes for which they were adopted and dedicated. The pertinent constitutional provisions state as follows:
La. Const. art. VI, §§ 26(B). Parish Ad Valorem Tax
(B) Millage Increase Not for General Purposes. When the millage increase is for other than general purposes, the proposition shall state the specific purpose or purposes for which the tax is to be levied and the length of time the tax is to remain in effect. All proceeds of the tax shall be used solely for the purpose or purpose set forth in the proposition.

La. Const. Art. VI, § 32. Special Taxes, Authorization.
For the purpose of acquiring, constructing, improving, maintaining or operating any work of public improvement, a political subdivision may levy special taxes when authorized by a majority of the electors in the political subdivision who vote thereon in an election held for the purpose.
(Bold emphasis in original; italicized emphasis added.) The above constitutional provisions clearly prohibit the use of dedicated and special taxes for purposes other than those for which they were dedicated or levied. See Orleans Parish School Board v. City of New Orleans, 238 La. 738, 116 So.2d 505 (1959); see also Denham Springs Economic Development District v. All Taxpayers, Property Owners, 04-1674, p. 35 (La.2/4/05), 894 So.2d 325, 836.
The City's argument relative to diversion of dedicated and special taxes addresses itself to a fundamental problem with La.Rev.Stat. 11:1481(1)(a)(i), which provides, in pertinent part, as follows:
Each sheriff and ex officio tax collector of the state of Louisiana, or other official responsible for such tax collection, is hereby authorized and required to deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax rolls to be exempted by virtue of the homestead exemptions of each respective parish, and the city tax collector for the city of New Orleans, or other official responsible for such tax collection, is hereby authorized and required to deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax roll to be exempted by virtue of homestead exemptions, for the city of New Orleans and the parish of Orleans which money each respective sheriff, tax collector, or any other person performing said duties shall remit to the Assessors' Retirement Fund in a lump sum from first tax collections each year or periodically at the same time said sheriff and tax collector shall disburse funds to the tax recipient bodies of his respective parish. The amount remitted to the Assessors' Retirement Fund shall be based on the total amount of taxes shown to be collectible on the roll, including that shown on the tax roll to be exempted by virtue of homestead exemption, on the date the tax roll is filed for collection.
*31 The majority opinion correctly sets forth a number of the well-established rules of statutory construction. See City of New Orleans v. LARF, 05-2548, at pp. 20, 22, 23, 986 So.2d at 17, 18, 19. Among those rules are the following: (1) the language of a statute is the "starting point" for ascertaining the legislature's intent in adopting that statute; (2) words and phrases are to be given their generally-prevailing meaning; (3) courts are bound to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to, and preserving, all words can legitimately be found; (4) the meaning and intent of a law must be determined by consideration of the law in its entirety; (5) of two possible ways to interpret a statute courts must choose the interpretation that upholds its constitutionality.
La.Rev.Stat. 11:1481(1)(a)(i) sets forth the first part of the legislature's scheme for financing LARF. Application of the well-recognized principles for construing constitutional provisions listed above reveals that the first sentence of La.Rev. Stat. 11:1481(1)(a)(i) [hereinafter referred to as "the deduct and remit requirement"] places an affirmative duty on officials responsible for tax collection in Louisiana parishes (and in the City of New Orleans) to deduct 0.25 percent of "collectible" ad valorem taxes and remit that 0.25 percent to LARF before dispersing the remainder of the ad valorem taxes to the tax-recipient bodies in their parishes. La.Rev.Stat. 11:1481(1)(a)(i). The second sentence of La.Rev.Stat. 11:1481(1)(a)(i) [hereinafter referred to as the "amount remitted provision"] reiterates that "the amount remitted... shall be based on the total amount of taxes shown to be collectible on the roll, including that shown on the tax roll to be exempted by virtue on the homestead exemption." Id. Significantly, nothing in the amount remitted provision modifies the fact that the deduct and remit requirement imposes on officials responsible for collecting taxes in Louisiana a duty to deduct the amount remitted to LARF from ad valorem taxes before dispersing the remainder of the taxes to the appropriate tax-recipient bodies; the "amount remitted provision" directs itself solely to determination of that amount.
The clarifying statement in the amount remitted provision is to be "based" on "collectible" ad valorem taxes, rather than ad valorem taxes actually collected, is significant, but not for the reason set forth in the majority opinion, the fallacy of which is fully discussed below. The reason the legislature required that the amount remitted to LARF be based on "collectible" taxes was to insure that LARF would receive a predictable amount of ad valorem taxes each year. Had the legislature based the remittance amount solely on actual collections, the amount would vary from year to year because the amount of ad valorem taxes actually collected depends on a number of factors, including such things as the percentage of taxpayers who actually pay their taxes and whether payments are made in a timely fashion. Of course, the legislature also specifically required that the amount remitted include 0.25 percent of taxes that would have been collected were they not exempted from collection by the homestead exemption.
When all of the pertinent rules of statutory construction are applied to La.Rev. Stat. 11:1481(1)(a)(i), the nature of the affirmative duty imposed on Louisiana officials who collect taxes emerges. That duty might be summarized as follows. First, officials collecting taxes must determine the total amount of "collectible" taxes-i.e., the amount of ad valorem taxes that would have been collected if there were no homestead exemption and no delinquencies. *32 The total amount of collectible taxes must then be multiplied by 0.25 percent. The resulting amount must then be deducted from the taxes actually collected, and remitted to LARF in a lump sum. Only then can the remainder of the ad valorem taxes collected be distributed to the tax-recipient bodies.
Significantly, if a given tax-recipient body receives only dedicated and/or special taxes, La.Rev.Stat. 11:1481 requires that a portion of those dedicated and/or special taxes be deducted and remitted to LARF before the remainder of the dedicated and special taxes may be distributed to the tax-recipient body. Because it requires that LARF be financed through the deduction and remission of a portion of all collectible taxes, including taxes dedicated to various other purposes, La.Rev.Stat. 11:1481(1)(a)(i) results in the diversion of dedicated and special taxes to purposes for which they were not dedicated or levied, for the benefit and to the advantage of LARF. This is the only reasonable interpretation of La.Rev.Stat. 11:1481(1)(a)(i) possible.
The majority decision in this case chooses to ignore this interpretation, the only reasonable interpretation of La.Rev. Stat. 11:1481(1)(a)(i) that complies with all the pertinent rules of statutory construction. The majority justifies its conclusion that La.Rev.Stat. 11:1481(1)(a)(i) can be interpreted as constitutional by focusing almost exclusively on the well-recognized rule that requires courts to choose the interpretation that upholds the constitutionality of a statute, when two possible interpretations exist. Ultimately, in its zeal to find that La.Rev.Stat. 11:1481(1)(a)(i) is constitutional, the majority simply ignores arguably the most important words in the provision-that is, the verbs deliberately chosen by the legislature in both the introductory phrase and in the deduct and remit requirement. The introductory phrase specifically provides that LARF "shall be financed" as described in the provision. Then, the deduct and remit requirement specifically directs Louisiana officials responsible for tax collection to deduct and remit 0.25 percent of all ad valorem taxes to LARF. In fact, the majority describes the first sentence of the provision as follows:
As enacted, the first sentence of this provision authorizes and requires the official responsible for tax collection in each respective jurisdiction "to deduct one-fourth of one percent of taxes shown to be collectible by the tax rolls, including that shown on the tax rolls to be exempted by virtue of the homestead exemptions," which money each tax collector is directed to "remit" to the Fund "in a lump sum from first tax collections each year or periodically at the same time said sheriff and tax collector shall disburse funds to the tax recipient bodies of his respective parish."
City of New Orleans, 05-2548 at 21, 986 So.2d at 17-18 (emphasis added). Nevertheless, the majority renders this affirmative directive meaningless in favor of its finding that La.Rev.Stat. 11:1481 merely sets forth a method of calculating the amount of ad valorem taxes due LARF. This interpretation is adopted despite the fact that no derivation of the word "calculate" (and no synonym for that word) appears anywhere in the statute.
According to the majority, La.Rev.Stat. 11:1481(1)(a)(i) results in an unconstitutional violation of the prohibitions against diversion of dedicated and special taxes only if the deduct and remit provision is read "in isolation." If the sentences of the provision are read together, no diversion of dedicated and special taxes is required, the majority says, because the "sentence which immediately follows the first one *33 [the amount remitted provision] elucidates and clarifies the intent of the provision." The amount remitted provision states as follows:
The amount remitted to the Assessors' Retirement Fund shall be based on the total amount of taxes shown to be collectible on the roll, including that shown on the tax roll to be exempted by virtue of homestead exemption, on the date the tax roll is filed for collection.
According to the majority, the above-quoted sentence makes it clear that La.Rev. Stat. 11:1481(1)(a)(i)does not prescribe the method of financing LARF (which, of course, is the purpose of the statute). Rather, the statute at issue does nothing except establish a calculation method, the majority concludes.
Because the amount remitted provision states that the "amount" is to be "based" on "collectible" taxes, the majority says that the deduct and remit requirement of La.Rev.Stat. 11:1481(1)(a)(i) does not really mean what it says! Instead, the majority finds that the statute's reference to "collectible" taxes makes it clear that no deduction and remission is intended, despite the clear and unambiguous language of the deduct and remit requirement! Noting that some collectible taxes are not actually collected (because they are exempted by the homestead exemption), the majority asserts that deductions cannot be made from amounts that are not actually collected. Thus, despite the affirmative language of the deduct and remit requirement of La.Rev.Stat. 11:1481(1)(a)(i), Louisiana officials responsible for tax collection are not actually required to deduct and remit 0.25 percent of collectible taxes, the majority says. Under the majority's reasoning, the verbs in the introductory phrase and in the deduct and remit requirement are rendered meaningless.
According to the majority, my interpretation is possible only if the first sentence of La.Rev.Stat. 11:1481(1)(a)(i) is read "in isolation." However, the fact is that the majority's interpretation reads the second sentence in isolation, completely writing out the language of the first sentence, which we must assume was deliberately chosen by the legislature. Further, the majority opinion offers no alternative to my interpretation of the deduct and remit requirement beyond the simple conclusion that it does not and cannot mean what it says! The stated purpose La.Rev.Stat. 11:1481 is to establish the manner by which LARF "shall be financed." However, rather than interpreting the statute in a manner that clarifies the appropriate method for financing LARF, the majority finds that La.Rev.Stat. 11:1481(1)(a)(i) does nothing more than set forth a calculation formula. In the process, the majority eviscerates the purpose of the statute and chooses an interpretation riddled with unanswered questions.
When it adopted La.Rev.Stat. 11:1481, the legislature chose the following descriptive title for the provision: "Financing of fund; deductions, deficiencies and surpluses; remedies." That title demonstrates that the legislature's purpose was to provide a method for financing LARF with deductions from ad valorem taxes. In fact, La.Rev.Stat. 11:1481 is the only Louisiana statute that sets forth a method for financing LARF. If the statute does not mean what it says, and officials responsible for collecting taxes are not supposed to deduct and remit a percentage of all ad valorem taxes to LARF, then how is the amount that results from the calculation formula to be remitted to LARF? The majority does not even attempt to answer that question. Thus, the majority leaves LARF with a calculation formula, but without any method for collecting the amounts resulting from that calculation. *34 Ultimately, Louisiana officials responsible for tax collection are left with no direction concerning the performance of their duties. Further, the majority's interpretation renders the entire statute meaningless because it can no longer be read to set forth a method of financing LARF.
The majority states that dedicated and special taxes cannot be used to fund LARF, but nevertheless finds that La.Rev. Stat. 11:1481 "can be interpreted in such a manner as to render it consistent, and not in conflict with the constitutional prohibitions against the diversion of dedicated or special taxes." City of New Orleans, 05-2548 at 25, 986 So.2d at 19. Although I am not sure exactly what that means, I assume it means that the "calculation method" that the majority finds is set forth in La.Rev.Stat. 11:1481(1)(a)(i) is constitutional, but that the amount must be paid only from taxes that are not dedicated to other purposes. Thus, I assume that the majority means to require that the amount derived from the calculation be paid out of some type of non-dedicated ad valorem taxes.
Of course, as I have already mentioned, La. Const. art. X, § 29(E)(3) lists only three possible sources of funding for retirement systems, and those sources are employer contributions, employee contributions, and dedicated taxes. Despite the fact that the constitutional provision does not mention non-dedicated taxes as a source of funding for retirement systems, the majority finds that non-dedicated ad valorem taxes are the only type of taxes that can be used to fund LARF. This fact I believe underscores an important problem with the majority's interpretation.
If the statutory language simply sets forth a calculation method for determining the amount of taxes due, how do Louisiana officials responsible for tax collection know what they should do? Since the majority finds that the words "finance," "deduct," and "remit," are essentially meaningless, the statute provides no direction concerning the question of who is to pay and in what percentages. If the statute does not require that some amount be "deducted" and "remitted" from every tax recipient body, then who pays? The fact is that all of the taxes received by some tax-recipient bodies are special and/or dedicated taxes. Does La.Rev.Stat. 11:1481 require that those tax-recipient bodies that happen to receive non-dedicated taxes be burdened with the responsibility of paying the entire amount derived from the calculation formula, despite the fact they receive only a portion of the underlying taxes? La.Rev. Stat. 11:1481 was carefully designed by the legislature to spread the liability for funding LARF among all of the ad valorem tax-recipient bodies in the State of Louisiana. The majority's interpretation places that burden on only a few of those tax-recipient bodiesi.e., those that receive non-dedicated ad valorem taxes.
Finally, I must note that the record in this case contains the Legislative Auditor's report showing the calculation of the City's alleged liability to LARF for the 2005 tax year. That report conclusively demonstrates that the calculation includes 0.25 percent of all the ad valorem taxes collectible by the City, including dedicated and special taxes. The report further demonstrates that my understanding of La.Rev. Stat. 11:1481 is shared by the Legislative Auditor. His report indicates that the 0.25 percent due LARF is to be deducted from the funds that would otherwise be received from each and every tax-recipient body in Orleans Parish, then remitted to LARF. Under the majority's interpretation, neither the Legislative Auditor nor Louisiana officials responsible for tax collection will have any idea what to do once they have *35 determined the amount of taxes due by using the calculation formula.
Diversion of dedicated and special taxes is prohibited by La. Const. art. VI, §§ 26(B) and 32. La.Rev.Stat. 11:1481 violates that constitutional provision because it requires that 0.25 percent of the "taxes shown to be collectible on the tax rolls" be deducted by sheriff's and tax collectors and remitted to LARF. The requirement that the specified percentage be deducted is not limited to the taxes that are not dedicated to other purposes, rather it includes all "taxes shown to be collectible on the tax rolls." Accordingly, the district court properly held that La.Rev.Stat. 11:1481 is unconstitutional.

Diversion of revenue sharing funds
The City argues, and the district court found, that La.Rev.Stat. 11:1481, as most recently amended by 2004 La. Act No. 860, unconstitutionally violates La. Const. art. VII, § 26, because it results in an improper diversion of revenue sharing funds in violation of the underlying purpose for which the revenue sharing provisions were made a part of the Louisiana Constitution, and because it constitutes an inappropriate interpretation of La. Const. art. VII, § 26 contrary to the intent of the framers of that provision. The majority opinion errs in rejecting this argument.
La. Const. art. VII, § 26(C), relative to revenue sharing, provides as follows:
(C) Distribution Formula. The revenue sharing fund shall be distributed annually as provided by law solely on the basis of population and number of homesteads in each parish in proportion to population and the number of homesteads throughout the state. Unless otherwise provided by law, population statistics of the last federal decennial census shall be utilized for this purpose. After deductions in each parish for retirement systems and commissions as authorized by law, the remaining funds, to the extent available, shall be distributed by first priority to the tax recipient bodies within the parish, as defined by law, to offset current losses because of homestead exemptions granted in this Article. Any balance remaining in a parish distribution shall be allocated to the municipalities and tax recipient bodies within each parish as provided by law.

(Emphasis added.)
The City claims that La.Rev.Stat. 11:1481(1)(a)(ii) and (iii), which provide as follows: violate the above constitutional provision:
(ii)(aa) All tax recipient agencies of ad valorem taxes of each and every parish and municipality of the state of Louisiana, including the police jury, council, commission, school board, levee district, special districts, municipalities and all tax recipients of any nature whatsoever of ad valorem taxes are hereby required to furnish the legislative auditor the authorizing ordinances or resolutions, the tax rolls, and the tax rate to be applied to the assessed values for ad valorem tax purposes no later than June first of every year.
(bb) The board shall certify to each sheriff and ex officio tax collector for the state of Louisiana, other official responsible for such tax collection, or any other person performing such duties for any person, parish, city, or governmental entity that all amounts due the fund have been received. For each payment received, the certification shall include the date the fund received the payment, the amount of the payment, and the jurisdiction remitting the payment.
(cc) The board shall calculate any shortfall in the fund and shall take reasonable steps to ascertain its cause. *36 The board shall certify to the legislative auditor the amount of the shortfall and its cause. In the event the shortfall is due to the failure of any person, parish, city, or other governmental entity to remit all funds required by this Section or any predecessor law, the certification shall so indicate.
(dd) The amounts due to the Assessors' Retirement Fund pursuant to this Paragraph shall be certified as correct by the legislative auditor.
(iii)(aa) In addition to the payment required pursuant to Item (i) of this Subparagraph, each sheriff and ex officio tax collector for the state of Louisiana, other official responsible for tax collection, or any other person performing such duties for any person, parish, city, or governmental entity certified by the board as having failed to remit all monies required by this Section, shall remit to the Assessors' Retirement Fund an amount to be determined by the board not to exceed fifteen percent of revenue sharing monies otherwise due to the delinquent parish, city, or other governmental entity over and above the portion being remitted to the fund by that person, parish, city, or governmental entity on July 1, 2004. The remittance pursuant to this Item shall be paid until the amount of the certified shortfall, including interest and any professional fees incurred through attempts at collection, has been satisfied; however, the board has the authority to negotiate a lesser amount to be paid in satisfaction of this debt. The board shall notify the sheriff and ex officio tax collector for the state of Louisiana, other official responsible for tax collection, or any other person performing such duties by November first that said remittance shall be due for the upcoming year.
(bb) Should the sheriff and ex officio tax collector for the state of Louisiana, other official responsible for such tax collection, or any other person performing such duties for any person, parish, city, or other governmental entity fail to comply with Subitem (aa) of this Item, the board of trustees of the Assessors' Retirement Fund is hereby empowered to make demand upon the state treasurer for the monies due to the fund. The treasurer shall pay such demand before distribution of any revenue sharing dollars to the person, parish, city, or other governmental entity. The board shall submit to the treasurer a resolution certifying the name of the governmental entity, its failure to pay, and the amount owed, and authorizing a designee or designees to act on its behalf.
(cc) The remedies provided in this Item are remedial and curative and may be exercised by the board at any time for any identifiable shortfall in the fund, regardless of when the shortfall initially arose.
Reduced to its essentials, La. Rev. Stat 11:1481(1)(a)(ii) and (iii) provide for the payment of "shortfalls" to LARF from revenue sharing funds prior to the distribution of those revenue sharing funds to the entity otherwise entitled to receive the funds. The majority finds that La.Rev. Stat. 11:1481(1)(a)(ii) and (iii) are constitutional because La. Const. art. VII, § 26(C), allows deductions for retirement systems ... as authorized by law."
Although La. Const. art. VII, § 26(C) does authorize some deductions to fund "retirement systems" prior to distribution of revenue sharing funds to the various tax-recipient bodies, I disagree with the majority's implicit conclusion that, so long as the deductions are for the purpose of funding retirement systems, La. Const. art. VII, § 26(C) authorizes the legislature to pass prospective legislation permitting *37 or providing for deductions without limitation, from revenue sharing funds that would otherwise be due tax-recipient bodies. In fact, allowing the legislature such unlimited power to divert revenue sharing funds violates both the language and the purpose of La. Const. art. VII, § 26, for several reasons that are further explained below.
In its discussion of this issue, the majority once again correctly sets forth a number of well-recognized principles of statutory construction that apply, not only to judicial construction of statutes, but also to judicial construction of constitutional provisions. Among those provisions is the rule, set forth in La. Civ.Code art. 9 that "when a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." Applying this principle in a vacuum, the majority concludes that the phrase "as authorized by law," which appears in La. Const. art. VII, § 26, is not ambiguous because "[a]n action is `authorized by law' when legislation has been enacted sanctioning the action." City of New Orleans, 05-2548 at 27, 986 So.2d at 21. Because "legislation has been enacted sanctioning" deductions for retirement systems in La.Rev.Stat. 11:1481, the majority concludes, the deductions are "authorized by law." In my view, the majority's simplistic and mechanical application of this single principle of statutory construction to the issues raised by this case is plainly erroneous.
First, let me say that I disagree with the majority's conclusion that La. Const. art. VII, § 26 is clear and unambiguous and therefore must be applied as written, given the fact that there are at least two obvious and reasonable interpretations of the pertinent language "deductions ... for retirement systems ... as authorized by law." "Ambiguous" is implicitly defined by La. Civ.Code art. 10 as "susceptible of different meanings." Even if one considers only the phrase "as authorized by law," on which the majority opinion is focused, the pertinent language clearly could refer only to those deductions authorized by law in 1973, when the 1974 Louisiana Constitution was adopted, as the City argues, just as it might refer to any deductions that might be authorized by law subsequent to the enactment of the 1974 Constitution, as LARF argues. Thus, I would find that the language is ambiguous on its face because it is susceptible of different meanings.
The ambiguity of the phrase "as authorized by law" in La. Const. art. VII, § 26(C) is demonstrated, I submit, by the fact that the very constitutional provision in question, La. Const. art. VII, § 26(C), uses two different phrases that might be considered to have the same or a similar meaning: "as provided by law," and "as authorized by law."[2] However, when the framer of a *38 legal provision, be it the legislature or the constitutional convention, employs different language, courts must assume that its choice of words was deliberate. See Mallard Bay Drilling, Inc. v. Kennedy, XXXX-XXXX, p. 22 (La.6/29/05), 914 So.2d 533, 549; Hall v. Brookshire Bros., Ltd., 2002-2404, p. 19 (La.6/27/03), 848 So.2d 559, 571. Thus, it must be presumed that, when the 1973 Constitutional Convention adopted La. Const. art. VII, § 26(C), it deliberately used two different phrases in the same paragraph, both of which could arguably apply "when legislation has been enacted sanctioning the action," which, the majority says, is the clear and unambiguous meaning of the phrase "as authorized by law."
However, when interpreting La. Const. art. VII, § 26(C), this court is required to assume that the two different phrases in the same paragraph have different meanings. That being the case, the meaning of the pertinent phrase "as authorized by law" is unquestionably ambiguous because it must be assumed that the Constitutional Convention deliberately chose those words to mean something different from "as provided by law." Because the phrase "as authorized by law" is ambiguous or "susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." La. Civ.Code art. 10. As set forth in detail below, in order to interpret La. Const. art VII, § 26(C) "as having the meaning that best conforms to the purpose of the law," it must be interpreted to limit deductions for retirement systems to those that were "authorized by law" at the time the provision was adopted by the 1973 Constitutional Convention.
In addition to the fact that the meaning of the phrase "as authorized by law" in La. Const. art. VII, § 26(C) is ambiguous, the majority's interpretation is erroneous because it completely ignores the stated purpose of that language. At the 1973 Constitutional Convention, Camille Gravel, the delegate who offered the amendment to the revenue sharing provision that was adopted, stated, as fully explained below, that the provision was intended to "continue" deductions for retirement systems "as currently authorized by law." Records of the Louisiana Constitutional Convention of 1973: Committee Documents and User Guides, vol. 14, p. 2070 (emphasis added). Delegate Gravel's explanations of the constitutional provision at issue are quoted below in their entirety. The majority was aware of these expressions of intent, as evidenced by the fact that it quotes Delegate Gravel's statements as part of its explanation of the City's argument. The majority's somewhat circular reason for rejecting the City's argument based on the stated purpose and intent of the constitutional provision was that, in its approach to interpretation, the City starts with the legislative history to construct an argument for ambiguity of the constitutional provision, rather than first arguing that the statute is ambiguous. See City of New Orleans, 05-2548 at 29, 986 So.2d at 22.
It is true that the first rule of statutory construction set forth in Louisiana's Civil Code is that clear and unambiguous laws must be applied as written. However, the majority has apparently overlooked the fact that the rules of statutory construction were themselves adopted in order to assist courts to discover the intent of the framers of the law. This principle is at least as well documented in Louisiana jurisprudence *39 as the one on which the majority relies. In fact, this court reiterated that principle earlier this year, when it stated as follows:
The function of statutory interpretation and the construction to be given to legislative acts rests with the judicial branch of the government. Theriot v. Midland Risk Ins. Co., 95-2895, p. 3 (La.5/20/97), 694 So.2d 184, 186. The rules of statutory construction are designed to ascertain and enforce the intent of the legislature. Succession of Boyter, 99-0761, p. 9 (La.1/7/00), 756 So.2d 1122, 1128; State v. Piazza, 596 So.2d 817, 819 (La.1992). Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. Boyter, 99-0761 at p. 9, 756 So.2d at 1128; Cat's Meow, Inc. v. City of New Orleans through Dep't of Fin., 98-0601, p. 15 (La. 10/20/98), 720 So.2d 1186, 1198. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the legislature to enact the law. State v. Johnson, 03-2993, p. 12 (La.10/19/04), 884 So.2d 568, 575; Theriot, 95-2895 at p. 3, 694 So.2d at 186.
State v. Dick, 2006-2223, p. 9-10 (La.1/26/07), 951 So.2d 124, 130 (emphasis added).
On the other hand, even if the majority were correct in its conclusion that the phrase "as authorized by law" in La. Const. art. VII, § 26(C) is clear and unambiguous, this court would face a dilemma in this case. Should the highest court of the State of Louisiana, the final arbiter of the meaning of a constitutional provision, when faced with an important public policy question, apply a rule of statutory construction, which was itself designed to ascertain and enforce the intent of the framers of the provision, in a manner that would admittedly frustrate the purpose and intent for which the constitutional provision was adopted?[3] The obvious answer to that question, I would submit, is "no." When the intent of a constitutional provision is known to the courts and to the parties to the dispute, it is the duty of this court, which has been entrusted with the task of determining the meaning of statutory and constitutional provisions, to interpret such provisions in a manner that gives effect to the framer's intent. To do otherwise would disrespect every important consideration underlying the rules of statutory and constitutional interpretation.
In fact, I believe, this principle is entrenched in the exact principle of statutory construction relied upon by the majority. In applying the rule that clear and unambiguous laws must be applied as written, the majority effectively ignores the express exception to that rule recognized in La. Civ.Code art. 9 itself. By its own terms, the rule that a clear and unambiguous law must be applied as written is subject to the qualifying language "when its application does not lead to absurd consequences." La. Civil Code art. 9. Clearly, it is absurd to apply a rule that was expressly designed to enforce the intent of the framers of a constitutional provision in a way that frustrates that very intent, especially while recognizing that intent, as the majority does here.
This court has previously recognized that "it is to be presumed that the legislature *40 intended such exceptions to its language as would avoid its leading to injustice, oppression, or absurd consequences." Progressive Sec. Ins. Co. v. Foster, 97-2985, p. 13 (La.4/23/98), 711 So.2d 675, 684. Thus, "the object of the court in construing a statute is to ascertain the legislative intent and, where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result." SWAT 24 Shreveport Bossier, Inc. v. Bond, 00-1695, p. 11 (La.6/29/01), 808 So.2d 294, 302. This has been a well-recognized principle of Louisiana law for almost two centuries, given the fact that it was set forth in Buhol v. Boudousquie, 8 Mart. (N.S.) 425(1830).
Because the phrase "as authorized by law" in La. Const. art. VII, § 26(C) is ambiguous and because the interpretation of that provision adopted by the majority leads to absurd consequences, I believe this court must consider the statements of the delegates to the 1973 Louisiana Constitutional Convention in order to determine their intent in adopting the provision. In fact, review of the "Records of the Louisiana Constitutional Convention of 1973" reveals that the meaning of the phrase "deductions... for retirement systems ... as authorized by law," was the subject of some discussion regarding that provision during the debates. Delegate Gravel's initial explanation of the phrase "deductions... for retirement systems ... as authorized by law" is quoted in full below:
Paragraph (D) [current paragraph (C)] of the proposed amendment makes it clear that after deductions for retirement systems and commissions, as presently authorized by law, that there shall be a first call on the monies distributed in each parish by those tax recipient bodies defined by law who suffer losses as a consequence of the homestead exemption.
Records of the Louisiana Constitutional Convention of 1973, vol. 14, p. 2070 (emphasis added).
The intent of the framers of the Louisiana Constitution to limit the "deductions... for retirement systems" to those that were authorized by law in 1973 is further indicated by the following colloquy that occurred during the debates concerning La. Const. art. VII, § 26(C):

Mr. Chatelain Delegate Gravel, I'd like to be cleared up on some things in Section (D) [current section (C)]. First, after deduction for retirement systems and commissionsI think I know what the commissions are: that's perhaps the sheriff's commission, running his officebut what retirement systems do you have reference to here, sir?

Mr. Gravel: Mr. Chatelain, I think that Mr. Mire could answer this question correctly. I think there's a provision that stems from the old property tax relief fund that something like a quarter or a half of one percent goes into certain state retirement systems, including the assessors'. What other retirement systems, I don't know. But, I do know there is some call on this money for retirement systems.... That's what ... this is to authorize the legislature to continue those.
Id. at 2071 (emphasis added).
In fact, at no time during the Constitutional Convention debate concerning La. Const. art. VII, § 26(C) did any delegate make any statement that would support the interpretation of the language "deductions... for retirement systems ... as authorized by law" adopted by the majority herein-that is, to allow the legislature in future years to invade the revenue sharing fund for retirement systems or for any other purpose. Rather, that language was intended to "authorize the legislature to *41 continue" deductions for retirement systems authorized by law prior to the adoption of the 1974 Constitution to compensate retirement funds for the repeal of the 5.75 mil state ad valorem tax that had been abolished. In view of the abolition of the state ad valorem tax, LARF, as well as other retirement systems, who had been entitled to deduction of a small variable percentage of the revenue sharing funds prior to the adoption of the new constitution and La. Const. art. VII, § 26(C), were accommodated by inclusion of that language to allow the continuation of those deductions.[4] However, as clearly revealed by the debates at the 1973 Constitutional Convention, La. Const. art. VII, § 26(C) was never intended to allow the legislature to adopt unlimited deductions from revenue sharing funds, even prospectively (or post-1974), whether for funding retirement systems, making them more sound actuarially, or otherwise. Thus, the majority's conclusion that the 1974 Constitution's provision allows post-1974 deductions from revenue sharing funds is erroneous.
A second reason La. Const. art. VII, § 26(C) cannot be interpreted to allow the legislature to pass legislation authorizing unlimited deductions from the revenue sharing fund, so long as the deductions are for the purpose of funding retirement systems, is that such an interpretation violates the purpose for which revenue sharing was itself adopted. The well-recognized constitutional purpose of the revenue sharing fund is to compensate tax-recipient bodies for revenues lost as a result of the adoption of the state-wide homestead exemption, and to correct the inequities in the old Property Tax Relief Fund that was invalidated by Levy v. Parker, 346 F.Supp. 897 (E.D.La.1972).[5] Even more specifically, revenue sharing was included in the constitution, according to Delegate Gravel, in order to restore the bonding capacity of tax-recipient bodies. Note the following statement made by Mr. Gravel when he introduced his amendment to La. Const. art. VII, § 26(C) at the 1973 Constitutional Convention:
Mr. Chairman and ladies and gentlemen of the convention, the proposed amendment... would, in effect, extend the committee's revenue sharing concept, and primarily for the purpose of restoring to some extent the shrunken bonding capacity of school boards and the other local governing bodies. I think, throughout the entire time that we have been discussing this article, valid *42 positions have been taken to the effect that because of the increased homestead exemption, there have been ... has been some encroachment upon (a) the tax base of local governing bodies, and (b) the bonding capacity of local governing bodies.

* * * * *
Paragraph (F) [currently paragraph (E)] provides that these constitutionally approved fundsthe revenue sharing fundare subject to being bonded and that when the bonds are issued and authorized as approved by the State Bond Commission, that they will then carry the full faith and credit of this state. Now, in sum, let me tell you this very clearly. The main reason why these provisions are essential in the constitution is to provide, to the extent herein provided, a bonding capacity which, in effect, has been taken away from local government as a consequence of the homestead exemption. For at least two sessions of the legislature, we have been faced with the very serious problem as to whether we could, by legislative act from year to year, provide for a revenue sharing fund, and then be sure that those funds could be bonded. Bond attorneys and others who are much more knowledgeable in the field than I am have consistently told us that unless there is some constitutional guarantee in this new constitutionsuch as we have by this proposed amendment, such as we did have prior to 1972 under the property tax relief fund in the Constitution of 1921that unless such provisions are set forth in the constitution that the bonding capacity of local governing bodies will be substantially curtailed and diminished.
Id. at 2064 (emphasis added).
The above statement makes it very clear that one of the major reasons (in fact, Delegate Gravel indicated it was perhaps the primary reason) the 1973 Constitutional Convention considered preservation of the revenue sharing fund to be an essential part of the Constitution was to restore the bonding capacity of tax-recipient bodies, which had been destroyed, or at least diminished, when those bodies lost the benefits of the taxes that became exempt under the homestead exemption. In fact, that purpose is inherent in La. Const. art. VII, § 26(E), relative to "Bonded Debt," which provides, in pertinent part, as follows:
A political subdivision, as defined by Article VI of this constitution, may incur debt by issuing negotiable bonds and may pledge for the payment of all or part of the principal and interest of such bonds the proceeds derived or to be derived from that portion of the funds received by it from the revenue sharing fund, to offset current losses caused by homestead exemptions granted by this Article.

(Emphasis added.)
Despite the concern of the delegates of the 1973 Constitutional Convention that revenue sharing funds be distributed to tax-recipient bodies "by first priority" (after deductions for retirement systems and commissions as then authorized by law) in order to protect the bonding capacity of those tax-recipient bodies, the majority has blessed a legislative enactment that will clearly have the opposite effect of diminishing or impairing the bonding capacity of tax-recipient bodies within the State. The majority's finding that La.Rev.Stat. 11:1481 does not violate the constitutional provision governing revenue sharing will have a negative impact on the bonding capacity of tax-recipient agencies because it necessarily introduces uncertainty into *43 the amount of revenue-sharing funds a tax-recipient body might receive from year to year.[6] If the portion of La.Rev.Stat. 11:1481 allowing deductions from revenue sharing funds is upheld as constitutional, the result is that tax-recipient bodies, as a practical matter, will be unable to "pledge for the payment of all or part of the principal and interest of ... bonds the proceeds derived or to be derived from that portion of the funds received by it from the revenue sharing fund," as La. Const. art. VII, § 26(E) expressly allows. La. Const. art. VII, § 26 was intended to protect the availability of revenue sharing funds to tax-recipient bodies who lost funds as a result of changes in state law prior to adoption of the 1974 Louisiana Constitution, particularly the homestead exemption, and to protect the bonding capacity of those tax-recipient bodies.
The reason the tax-recipient bodies will be unable to pledge those proceeds is because LARF's board of directors is empowered by La.Rev.Stat. 11:1481(1)(a)(i)(iii)(bb) to "make demand upon the state treasurer for the monies due to the fund" and the state treasurer is thereafter required to "pay such demand before distribution of any revenue sharing dollars" to a tax-recipient body that has not paid an amount currently due. The tax-recipient bodies are thereby deprived of use of revenue sharing funds equal to 0.25 percent of the "taxes shown to be collectible by the tax rolls." As I read La.Rev.Stat. 11:1481(1)(a)(iii), the percentage of revenue sharing funds that might be deducted for the benefit of LARF for payment of current and past due amounts prior to distribution to the tax-recipient bodies is potentially unlimited. If a tax-recipient body's revenue sharing funds could be completely depleted prior to distribution for the benefit of LARF, that tax-recipient body would have no revenue sharing funds to undergird its bonding capacity. This is true despite the fact that the revenue sharing fund was intended by the framers of the constitution to protect the bonding capacity of the tax-recipient body, and not to ensure payment of debts, whether unquestionably or even questionably, due to another state entity.
Presumably, the Louisiana Legislature, when it adopted La.Rev.Stat. 11:1481, did not intend to deprive tax-recipient bodies of the entirety of their revenue sharing funds. However, the existence of such a possibility must be acknowledged before the total impact of La.Rev.Stat. 11:1481 can be appreciated. Further, the fact that the "worse case scenario" allowed by the statute is unlikely to occur does not change the fact that La.Rev.Stat. 11:1481 is patently unconstitutional. The provision clearly violates La. Const. art. VII, § 26, relative to revenue sharing, both because it allows a deduction (to fund a retirement system) that was never intended by the framers of the 1974 Louisiana Constitution, and because it could easily impair the bonding capacity of tax-recipient bodies, in violation of the primary purpose for which the revenue sharing constitutional provision was adopted. Under the majority opinion, the ability of Louisiana tax-recipient bodies to pledge their revenue sharing funds to secure bonds would be irreparably destroyed, because presumably no bonding agency would accept such uncertain funds as pledge to secure bonds because it would reduce the amount of funds *44 available to tax-recipient bodies to repay bonds.

CONCLUSION
For the foregoing reasons, La.Rev.Stat. 11:1481, adopted by the legislature to determine the required contributions of ad valorem taxes from tax-recipient bodies to LARF and to facilitate transmission by the state treasurer to LARF of revenue sharing funds otherwise due to tax-recipient bodies, violates provisions of the Louisiana Constitution that were designed to protect dedicated taxes, specifically La. Const. art. VI, §§ 26(B) and 32. In addition, La.Rev. Stat. 11:1481 violates the provision of the Louisiana Constitution that governs distribution of revenue sharing funds, specifically La. Const. art. VII, § 26. For these reasons, I would affirm the district court's judgment which held that La.Rev. Stat. 11:1481 is unconstitutional on both of these grounds. Accordingly, I dissent from the majority's finding that La.Rev. Stat. 11:1481 is constitutional.
JOHNSON, J., concurring.
The Louisiana Assessors' Retirement Fund is a statewide public retirement fund, but not guaranteed by the state. Therefore, the shortfalls in the annual calculation of actuarially required contributions cannot be paid directly by the state treasurer from the state general fund. It is for this reason that the Constitution grants the legislature the power to ensure that each retirement system is actuarially sound.
La. Const. Art. X, § 29(E)(3),[1] specifically authorizes the legislature to finance a retirement fund from dedicated taxes. Section 29(E)(3) mandates that the legislature establish a method to enable statewide public retirement systems to attain and maintain actuarial soundness. Additionally, Section 29(E)(3) requires that the legislature determine the contributions to be made by members, employers, and from dedicated taxes for those systems and requires the elimination of unfunded accrued liability in retirement systems by the year 2029, commencing with the fiscal year 1989-1990.
With respect to statewide retirement systems, such as the Assessors' Retirement Fund, the legislature authorizes a variety of funding mechanisms to enable the systems to attain and maintain actuarial soundness, such as direct contributions from employers and employees, ad valorem taxes, dedicated taxes, and revenue sharing.
This Court stated in Louisiana Municipal Association v. State of Louisiana and Firefighters' Retirement System, 04-0227 (La.1/19/05), 893 So.2d 809, 850-851, that:
... the legislative power of the state is vested in the legislature. La. Const. art. 10, § 3. "In its exercise of the entire legislative power of the state, the legislature may enact any legislation that the state constitution does not prohibit." The Louisiana Constitution mandates in Section 29(E) that the legislature must attain and maintain actuarial soundness of the state and statewide public retirement systems. The Louisiana Constitution *45 does not dictate how that actuarial soundness is to be accomplished, nor does it prescribe how the state and statewide public retirement systems are to be funded. The mechanism by which actuarial soundness is achieved is left to the discretion of the legislature.
In my view, it is well within the Legislature's discretion to determine how shortfalls will be resolved. It is within the Legislature's prerogative to identify a source of funding, and to determine the percentage of the contributions owed by the contributors. La. Const. Art. VII, § 26(C) specifically authorizes deductions from revenue sharing funds those amounts due by each parish to the retirement system.
La. Const. Art. VII, § 26, relating to the revenue sharing fund, provides:
(C) Distribution Formula. The revenue sharing fund shall be distributed annually as provided by law solely on the basis of population and number of homesteads in each parish in proportion to population and the number of homesteads throughout the state. Unless otherwise provided by law, population statistics of the last federal decennial census shall be utilized for this purpose. After deductions in each parish for retirement systems and commissions as authorized by law, the remaining funds, to the extent available, shall be distributed by first priority to the tax recipient bodies within the parish, as defined by law, to offset current losses because of homestead exemptions granted in this Article. Any balance remaining in a parish distribution shall be allocated to the municipalities and tax recipient bodies within each parish as provided by law.
The formula for collecting taxes, as provided in LSA-R.S. 11:1481, does not mandate that the amounts due to the Retirement Fund be paid from dedicated taxes. Nor does it prohibit political subdivisions from using dedicated taxes to pay the Retirement Fund. The statute leaves it to the discretion of the political subdivision to determine the source of money to be remitted to the Retirement Fund. Not all of the taxes shown to be collectible on the City's tax rolls are dedicated taxes. Thus, the City of New Orleans could meet its obligations under the statute without using any portion of dedicated taxes.

ON APPLICATION FOR REHEARING
Rehearing denied.
CALOGERO, Chief Justice, Would Grant Rehearing and Assigns Reasons.
Because I would grant the application for rehearing filed by the City of New Orleans and the Honorable R. Ray Nagin, Mayor, in His Individual Capacity (hereinafter referred to collectively as "the City"), I respectfully dissent from the majority's decision to deny the application. For the reasons set forth in detail in my dissent to the original opinion, I agree with the City's arguments that the current version of La. Rev.Stat. 11:1481, governing financing of the Louisiana Assessors' Retirement Fund ("LARF") is unconstitutional because it violates La. Const. art. VI, §§ 26(B) and 32, which prohibit the diversion of special and dedicated taxes.
In fact, the majority in this case admitted that the Louisiana Legislature is prohibited by the state constitution from diverting dedicated taxes, but nevertheless found that La.Rev.Stat. 11:1481 is constitutional because it does not require the diversion of special or dedicated taxes, but instead merely sets forth a formula for calculating the amounts due to LARF. As the City argues, that conclusion is inconsistent with the manner in which the statute has been interpreted and applied for *46 decades by LARF, the 63 Louisiana parishes other than Orleans, and the Legislative Auditor, all of which have interpreted and applied the statute to require the remittance of a percentage of dedicated and special taxes. As I noted in my dissent to the majority opinion, the record in this case contains the Legislative Auditor's report showing the calculation of the City's alleged liability to LARF for the 2005 tax year, and that report unequivocally demonstrates that the calculation includes 0.25 percent of all ad valorem taxes collectible by the city, including dedicated and special taxes. Further, as the City points out in its application for rehearing, LARF argued in this court, not that La.Rev.Stat. 11:1481 does not require the diversion of dedicated and special taxes, but that such diversion was authorized by La. Const. art. X, § 26(B). LARF also admitted that none of the 63 parishes other than Orleans have ever asserted that they were not allowed to divert a portion of dedicated and special taxes to LARF, indicating that those parishes routinely deduct and remit a portion of dedicated and special taxes to LARF.
As discussed below, my dissent sets forth the only reasonable interpretation of La.Rev.Stat. 11:1481. Further, as the City points out in its application for rehearing, the Legislative Auditor, LARF, and the officials in 63 Louisiana parishes agree with my interpretation of La.Rev.Stat. 11:1481. That being the case, this court should have applied the contemporaneous construction doctrine, recognized the unconstitutional nature of the statute and the unconstitutional manner in which it has been interpreted and applied, and granted the City's motion for summary judgment. Alternatively, if the majority believes that the record is insufficient to prove that the interpretation and application of the statute by such officials is unconstitutional, it should have recognized the existence of a genuine issue of material fact on the issue and remanded to the district court for development of a record.
Further, I agree with the City's argument that the court's holding that La.Rev. Stat. 11:1481 does not require the diversion of dedicated taxes, but simply establishes a method for calculating the amount that must be paid LARF from non-dedicated taxes could lead to absurd results. The majority decision herein allows tax-recipient bodies to increase their millages, then places the sole obligation for paying the increase in the amount due to LARF on those containing non-dedicated taxes, which have no control over the increase in millages obtained by the tax-recipient bodies that receive only dedicated and special taxes. Thus, a tax-recipient body receiving dedicated and/or special taxes may increase its millages without consequence, while funds containing non-dedicated taxes are required to pay ever-increasing amounts to LARF, making it impossible for those funds to anticipate the amount of monies that might actually be available to pay for the fund's other responsibilities.
As I stated in my dissent to the original opinion, the only reasonable interpretation of La.Rev.Stat. 11:1481 is that it requires that 0.25 percent of the "taxes shown to be collectible on the tax rolls" be deducted by sheriff's and tax collectors and remitted to LARF. Thus, the plain and unambiguous language of the statute requires the diversion of dedicated and special taxes to LARF. In fact, as demonstrated in the above discussion of LARF's arguments in this court, all of the parties to this case recognized that the challenged statute requires the diversion of dedicated and special taxes. Although the majority found that diversion of such taxes is unconstitutional, it developed a new theory to support its conclusion that the statute was *47 nevertheless constitutional, thereby ignoring the plain and unambiguous language of the statute and the interpretation and application of the statute by the state officials who administer it.
For the reasons stated in my dissent to the original majority decision, I also believe that La.Rev.Stat. 11:1481 is unconstitutional because it violated La. Const. art. VII, § 26, governing revenue sharing. Finally, I agree with the City's argument that the court should revisit the equal protection argument because the City presented sufficient evidence to show the existence of a genuine issue of material fact sufficient to preclude summary judgment in favor of LARF on that issue.
NOTES
[1] A brief review of that litigation is helpful in understanding the posture of the present case.

Litigation commenced in 1994 when the Fund filed suit against the City seeking to recover amounts allegedly owed by the City pursuant to LSA-R.S. 11:82 and 11:1481, which, as originally enacted, required the City to remit one percent of its ad valorem taxes to the Fund. The City responded to the suit and filed a reconventional demand against the Fund, challenging the constitutionality of LSA-R.S. 11:1481. Marc Morial, then mayor of the City of New Orleans, intervened in the suit both in his capacity as mayor and as an individual City taxpayer. Following a trial in 2001, the district court declared LSA-R.S. 11:1481 and 11:82 unconstitutional on equal protection grounds. The Fund appealed the district court's judgment directly to this court, which reversed and remanded for further proceedings. Louisiana Assessors' Retirement Fund v. City of New Orleans, 02-1435 (La.2/7/03), 849 So.2d 1227.
On remand, the district court again declared LSA-R.S. 11:1481 and 11:82 unconstitutional as being in violation of the equal protection clause. In a per curiam, this court determined that the district court committed several procedural errors in reaching its conclusions. As a result, we vacated the judgment of the district court and remanded the case for further proceedings. Louisiana Assessors' Retirement Fund v. City of New Orleans, 03-3009 (La. 1/26/04), 864 So.2d 200.
[2] Louisiana Constitution article V, § 5(D) provides this court with appellate jurisdiction when "a law or ordinance has been declared unconstitutional." Pursuant to La. Const. art. V, § 5(F), "the supreme court has appellate jurisdiction over all issues involved in a civil action properly before it."
[3] The Fund was originally created by 1950 Acts. No. 91, § 1 and consisted of LSA-R.S. 47:1913 through 47:1921.
[4] Today, the Fund's membership extends to assessors, full-time permanent employees of assessors, the secretary and regular employees of the Fund, and permanent employees of the Louisiana Assessors' Association and the Louisiana Assessors' Insurance Fund. LSA-R.S. 11:1410(B)(1).
[5] La. Const. art. X, § 29(E)(1) provides:

The actuarial soundness of state and statewide retirement systems shall be attained and maintained and the legislature shall establish, by law, for each state or statewide retirement system, the particular method of actuarial valuation to be employed for purposes of this Section.
[6] The full text of La. Const. art. X, § 29(E)(3) is as follows:

For statewide public retirement systems not covered by Paragraphs (A) and (B) of this Section, the legislature shall determine all required contributions to be made by members, contributions to be made by employers, and dedicated taxes required for the sound actuarial maintenance of the systems, including the elimination of the unfunded accrued liability as of the end of the 1988-1989 Fiscal Year, under the method of valuation selected under (1) above, by the year 2029, commencing with Fiscal Year 1989-1990.
[7] The constitutional attack in this case is directed only at the statutory provisions addressing "dedicated taxes," and does not extend to the statutory provisions governing employer contributions, LSA-R.S. 11:1481(1)(b), or those governing member contributions, LSA-R.S. 11:1481(2)(a).
[8] We cite LSA-C.C. art. 8 as persuasive. A statute cannot dictate how to interpret the constitution.
[9] In fact, the record in this case confirms that the statute can be constitutionally applied. In support of its motion for partial summary judgment, the City introduced a letter from the legislative auditor certifying that, based on the 2005 tax roll, the City owed $1,132,016.15 to the Fund. It also introduced evidence establishing that, with the exception of a "General Municipal Purposes" tax, every tax on which the legislative auditor based its assessment of the City's liability to the Fund for the 2005 tax year is dedicated by the constitution, by statute and/or by the electorate for a specific purpose. However, the evidence demonstrates that the 14.91 mill tax for "General Municipal Purposes" generated $38,834,734.61 in revenues in 2005. Thus, the City's $1,132,016.15 obligation to the Fund could have been paid entirely with tax revenues not dedicated to a special use.
[10] Neither does a literal interpretation of the words "authorized by law" produce an absurd result, at odds with the stated purposes of the revenue sharing fund, as suggested by the City. While the stated purpose of the revenue sharing fund is to offset losses due to the homestead exemption, the distribution formula of section 26(C) clearly provides for deductions for retirement systems and commissions before distribution of revenue sharing monies to offset losses. In other words, according to the plain language of the constitutional provision, the purpose of the revenue sharing fund is to offset losses due to the homestead exemption, after deductions for retirement systems and commissions "as authorized by law," not the other way around.
[11] In support of its argument, the City cites to dicta in a ruling by Judge Tobias in related litigation, Louisiana Assessors' Retirement Fund v. City of New Orleans, No. 94-5896, on the docket of the Civil District Court, Parish of Orleans. We do not find the cited language from Judge Tobias persuasive, as the comments appear as dicta in reasons for judgment issued in conjunction with a ruling that ultimately ordered the City to supplement and amend the plea of unconstitutionality to conform to the requirements of LSA-C.C.P. arts. 1871, et seq.
[12] This judgment was subsequently reversed by this court in Louisiana Assessors' Retirement Fund v. City of New Orleans, 02-1435 (La.2/7/03), 849 So.2d 1227, and remanded to the district court for further proceedings.
[13] We do not attempt to rule or comment on any issues or matters that arose or occurred before the 2004 amendment to the statute.
[14] Moreover, while the City argues that including municipal taxes in the required contributions to the Fund by the City and Parish of Orleans while excluding them from the required contributions from other parishes does not treat alike those taxpayers similarly situated, this argument is unconvincing, given that New Orleans has a consolidated city/parish government and thus is not similarly situated to those parishes in which municipal taxes have not historically appeared on the tax rolls. The City offered no evidence to demonstrate that its taxpayers are treated any differently than those in other consolidated city/parish governments in the state with respect to municipal ad valorem taxes.
[15] In conjunction with this argument, the City also asserts that the alleged disparate treatment LSA-R.S. 11:1481 affords taxpayers in the City of New Orleans by the inclusion of municipal taxes in the calculation of the City's required contribution to the Fund violates La. Const. art. XIV, § 16(A)(7), which requires that ad valorem taxes be levied uniformly throughout the state. The City's assertion in this regard is without merit because LSA-R.S. 11:1481 does not impose an ad valorem tax, but rather is an internal funding statute that allocates money from one source to another.
[1] Rather the legislature declared in La.Rev. Stat. 11:82(A) that 0.25 percent of "aggregate taxes shown to be collectible by the rolls of each parish" are dedicated funds for LARF. However, this declaration does not qualify as a properly levied dedicated tax, as contemplated by La. Const. art. X, § 29(E).
[2] La. Const art. VII, § 26 contains the phrase "as provided by law" several times, but also contains the phase "as authorized by law." A close examination of the section reveals a logical explanation of why these two different phrases were used by the framers; in short, these two different phrases have different meanings. The drafters used "as provided by law" to refer to laws yet to be passed, or prospective events, such as the determination annually of the amounts of revenue sharing funds to be distributed, or the decision of how to handle balances that will remain in the future. On the other hand, "as authorized by law" is used only once in this paragraph, and it is used as a modifying phrase to explain just what deductions are to be made in each parish for retirement systems and commissions i.e., those deductions which were presently authorized by law and in existence at the time of the passage of the 1974 Constitution. If the framers intended to allow the legislature to increase the deductions for retirement systems at some point in the future, why would they not have been consistent and used the phrase "as provided by law" as they did elsewhere in § 26 when discussing prospective events?
[3] The revenue sharing provision was placed in the Constitution in order to put beyond the power of the legislature the possible enactment of a prospective statute to invade the revenue sharing fund, a fund that is for the benefit of the tax-recipient bodies throughout the state.
[4] In fact, limiting deductions from the revenue sharing fund for retirement systems to amounts lost as a result of the repeal of the state ad valorem tax, which were the only "deductions ... for retirement systems ... authorized by law" in 1973, is consistent with the revenue sharing "scheme." As stated infra, the primary purpose of the revenue sharing fund is to compensate tax-recipient bodies for revenues lost as a result of adoption of the homestead exemption. Thus, the revenue sharing fund was designed to minimize the financial impact of changes in state law on local tax-recipient bodies. In an effort to meet that goal, revenue sharing funds are distributed to all tax-recipient bodies as reimbursement for losses caused by the homestead exemption. Similarly, the deductions from revenue sharing for retirement systems are designed to reimburse the retirement systems for losses of revenue caused by repeal of the state's ad valorem tax. Seen in that light, the revenue sharing fund has a consistent purposemaking up for losses sustained prior to adoption of the 1974 Constitution caused by changes in state law.
[5] In Levy, the federal district court held that Louisiana's Property Tax Relief Fund, as governed by Louisiana constitutional and statutory provisions and administered by state officials, violated the equal protection clause of the United States Constitution, because distributions in Orleans Parish were unequal when compared to distributions for like property in other parishes. 346 F.Supp. 897.
[6] Of course, the legislature is required to appropriate $90 million annually to the revenue sharing fund. See La. Const. art. VII, § 26(B). The presence of this requirement in the Louisiana Constitution imposes a constitutional duty on the legislature to provide for the $90 million annually.
[1] La. Const. Art. X, § 29(E)(3), relating to retirement benefits, provides:

(E)(3) For statewide public retirement systems not covered by Paragraphs (A) and (B) of this Section, the legislature shall determine all required contributions to be made by members, contributions to be made by employers, and dedicated taxes required for the sound actuarial maintenance of the systems, including the elimination of the unfunded accrued liability as of the end of the 1988-1989 Fiscal Year, under the method of valuation selected under (1) above, by the year 2029, commencing with Fiscal Year 1989-1990.